# U.S. District Court
## United States District Court - District of New Mexico (Albuquerque)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00601-DHU-KK

Divelbliss v. Bard Access Systems, Inc. et al
Assigned to: District Judge David H. Urias
Referred to: Magistrate Judge Kirtan Khalsa
Case in other court: Twelfth Judicial District Court, 22cv432
Cause: 28:1446 Petition for Removal- Personal Injury

Date Filed: 08/12/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

Kimberly Divelbliss                                   represented by   **Charles N Lakins**
Lakins Law Firm, P.C.
PO Box 91357
Albuquerque, NM 87199
(505) 404-9377
Fax: (877) 604-8340
Email: Charles@LakinsLawFirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Bard Access Systems, Inc.                             represented by   **Christopher A. Rojao**
McCarter & English, LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102
(973) 622-4444
Email: crojao@mccarter.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward J. Fanning**
McCarter & English, LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102
(973) 622-4444
Email: efanning@mccarter.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wilfred P. Coronato**
McCarter & English, LLP
Four Gateway Center

100 Mulberry St.
Newark, NJ 07102
(973) 622-4444
Email: wcoronato@mccarter.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Kittleson**
Modrall Sperling Roehl Harris & Sisk PA
500 4th Street NW
Suite 1000
Albuquerque, NM 87102
505-848-1800
Fax: 505-848-9710
Email: jkittleson@modrall.com
*ATTORNEY TO BE NOTICED*

**Alex Cameron Walker**
Modrall, Sperling, Roehl, Harris & Sisk,
P.A.
500 Fourth St NW
Suite 1000
Albuquerque, NM 87102
505-848-1861
Fax: 505-848-1882
Email: awalker@modrall.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **C.R. Bard, Inc.** | represented by | **Christopher A. Rojao** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward J. Fanning**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wilfred P. Coronato**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Kittleson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alex Cameron Walker**

(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/12/2022 | 1 | NOTICE OF REMOVAL by C.R. Bard, Inc., Bard Access Systems, Inc. from Twelfth Judicial District Court, case number D-1215-CV-2022-00432. ( Filing Fee - Online Payment), filed by C.R. Bard, Inc., Bard Access Systems, Inc.. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet)(Walker, Alex) (Entered: 08/12/2022) |
| 08/12/2022 | 2 | Corporate Disclosure Statement by Bard Access Systems, Inc., C.R. Bard, Inc. identifying Corporate Parent Becton, Dickinson and Company, Corporate Parent Bard Access Systems, Inc. for Bard Access Systems, Inc., C.R. Bard, Inc.. (Walker, Alex) (Entered: 08/12/2022) |
| 08/12/2022 |  | Filing and Administrative Fees Received: $ 402 receipt number ANMDC-8411011 re 1 Notice of Removal, filed by Bard Access Systems, Inc., C.R. Bard, Inc. (Payment made via Pay.gov)(Walker, Alex) (Entered: 08/12/2022) |
| 08/12/2022 |  | United States Magistrate Judge Jerry H. Ritter and United States Magistrate Judge Kirtan Khalsa assigned. (dr) (Entered: 08/12/2022) |
| 08/12/2022 | 3 | PLEASE TAKE NOTICE that this case has been randomly assigned to United States Magistrate Judge Jerry H. Ritter to conduct dispositive proceedings in this matter, including motions and trial. Appeal from a judgment entered by a Magistrate Judge will be to the United States Court of Appeals for the Tenth Circuit. **It is the responsibility of the case filer to serve a copy of this Notice upon all parties with the summons and complaint.** *Consent is strictly voluntary, and a party is free to withhold consent without adverse consequences. Should a party choose to consent, notice should be made no later than 21 days after entry of the Order setting the Rule 16 Initial Scheduling Conference.* For e-filers, visit our Web site at www.nmd.uscourts.gov for more information and instructions. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (dr) (Entered: 08/12/2022) |
| 08/15/2022 | 4 | INITIAL SCHEDULING ORDER by Magistrate Judge Kirtan Khalsa. Counsel are to meet and confer by 8/31/2022. The parties' Joint Status Report and Provisional Discovery Plan is due by 9/12/2022. A Telephonic Rule 16 Initial Scheduling Conference is set for 9/21/2022 at 10:30 AM before Judge Khalsa. Counsel are to call the Court's AT&T conference line at (877) 848-7030 and enter the code 7324132 to connect to the proceedings. Unless otherwise notified by the Clerk or the Court a notice of consent or non-consent for this case to proceed before the trial Magistrate Judge should be submitted by each party no later than 9/15/2022. (kmt) (Entered: 08/15/2022) |
| 08/15/2022 | 5 | NOTICE by Bard Access Systems, Inc., C.R. Bard, Inc. *Notice of Agreed Extension of Time for Defendants to Move, Plead or Otherwise Respond to Plaintiffs Complaint* (Walker, Alex) (Entered: 08/15/2022) |
| 08/23/2022 | 6 | MOTION to Dismiss *For Improper Venue, or for Lack of Jurisdiction* by Kimberly Divelbliss. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Lakins, Charles) (Entered: 08/23/2022) |
| 08/23/2022 | 7 | NOTICE by Kimberly Divelbliss *of Subpoena to Dr. U.R. Dim* (Attachments: # 1 Exhibit) (Lakins, Charles) (Entered: 08/23/2022) |
| 08/24/2022 | 9 | NOTICE OF CONSENT SUBMISSION DEADLINE: Pursuant to Fed. R. Civ. P. 73(b)(2), the parties are reminded that a magistrate judge was assigned as the trial judge in this |

| | | |
|---|---|---|
| | | matter under 28 U.S.C. 636(c). The parties are advised that the Clerk will reassign this matter to a district judge as the trial judge no later than **9/5/2022** unless consents from all parties have been filed. The parties are free to withhold consent. *If you have already entered your consent, you need not resubmit.* (cd) <br> [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 08/24/2022) |
| 08/24/2022 | 10 | PLEASE TAKE NOTICE that this case has been reassigned to United States District Judge David H. Urias as the trial judge. <br><br> Under D.N.M.LR-Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges. <br><br> ***Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document.*** **Kindly reflect this change in your filings.** <br><br> United States Magistrate Judge Jerry H. Ritter no longer assigned to this case. <br> [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jg) (Entered: 08/24/2022) |
| 08/25/2022 | 11 | ASSOCIATION of Attorney Licensed Outside the District for Defendants Bard Access Systems, Inc., C.R. Bard, Inc. by Alex Cameron Walker on behalf of: <br> Christopher A. Rojao <br> McCARTER & ENGLISH, LLP <br> Four Gateway Center, 100 Mulberry St. <br> Newark, NJ 07102 <br> (973) 622-4444 <br> Fax (973) 624-7070 <br> crojao@mccarter.com <br><br> (Association Dues - Online Payment) <br> (Walker, Alex) <br> [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 08/25/2022) |
| 08/25/2022 | 12 | ASSOCIATION of Attorney Licensed Outside the District for Defendants Bard Access Systems, Inc., C.R. Bard, Inc. by Alex Cameron Walker on behalf of: <br> Edward J. Fanning, Jr. <br> McCARTER & ENGLISH, LLP <br> Four Gateway Center, 100 Mulberry St. <br> Newark, NJ 07102 <br> (973) 622-4444 <br> Fax (973) 624-7070 <br> efanning@mccarter.com <br><br> (Association Dues - Online Payment) <br> (Walker, Alex) <br> [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 08/25/2022) |
| 08/25/2022 | 13 | ASSOCIATION of Attorney Licensed Outside the District for Defendants Bard Access Systems, Inc., C.R. Bard, Inc. by Alex Cameron Walker on behalf of: <br> Wilfred P. Coronato <br> McCARTER & ENGLISH, LLP <br> Four Gateway Center, 100 Mulberry St. <br> Newark, NJ 07102 <br> (973) 622-4444 <br> Fax (973) 624-7070 |

| | | |
|---|---|---|
| | | wcoronato@mccarter.com<br><br>(Association Dues - Online Payment)<br>(Walker, Alex)<br>[THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 08/25/2022) |
| 08/25/2022 | 14 | NOTICE by Bard Access Systems, Inc., C.R. Bard, Inc. *Notice of Certification of Good Standing of Associated Counsel Christopher A. Rojao* (Walker, Alex) (Entered: 08/25/2022) |
| 08/25/2022 | 15 | NOTICE by Bard Access Systems, Inc., C.R. Bard, Inc. *Notice of Certification of Good Standing of Associated Counsel Edward J. Fanning, Jr.* (Walker, Alex) (Entered: 08/25/2022) |
| 08/25/2022 | 16 | NOTICE by Bard Access Systems, Inc., C.R. Bard, Inc. *Notice of Certification of Good Standing of Associated Counsel Wilfred P. Coronato* (Walker, Alex) (Entered: 08/25/2022) |
| 08/25/2022 | | Association Dues Received: $ 100 receipt number ANMDC-8431232 re: # 11 Association of Attorney Licensed Outside the District, filed by Bard Access Systems, Inc., C.R. Bard, Inc. (Payment made via Pay.gov)(Walker, Alex) (Entered: 08/25/2022) |
| 08/25/2022 | | Association Dues Received: $ 100 receipt number ANMDC-8431237 re: # 12 Association of Attorney Licensed Outside the District,, filed by Bard Access Systems, Inc., C.R. Bard, Inc. (Payment made via Pay.gov)(Walker, Alex) (Entered: 08/25/2022) |
| 08/25/2022 | | Association Dues Received: $ 100 receipt number ANMDC-8431245 re: # 13 Association of Attorney Licensed Outside the District,, filed by Bard Access Systems, Inc., C.R. Bard, Inc. (Payment made via Pay.gov)(Walker, Alex) (Entered: 08/25/2022) |
| 08/26/2022 | 17 | NOTICE REGARDING DOCUMENT ENTRIES: Because this case has been reassigned to a district judge, please be advised that any documents filed by the parties under Rule 73(b) have been permanently removed from the docket. Document(s) removed: No. 8. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (kg) (Entered: 08/26/2022) |
| 09/06/2022 | 18 | MEMORANDUM in Opposition *to Plaintiffs Motion to Remand* filed by Bard Access Systems, Inc., C.R. Bard, Inc.. (Attachments: # 1 Exhibit A) (Walker, Alex) (Entered: 09/06/2022) |
| 09/08/2022 | 19 | Joint MOTION to Vacate *the Initial Scheduling Order* by Bard Access Systems, Inc., C.R. Bard, Inc.. (Walker, Alex) (Entered: 09/08/2022) |
| 09/12/2022 | 20 | ORDER VACATING INITIAL SCHEDULING ORDER AND FINDING GOOD CAUSE TO DELAY by Magistrate Judge Kirtan Khalsa. The parties' Joint Motion to Vacate the Initial Scheduling Order (Doc. 19) is granted. The Court's Initial Scheduling Order (Doc. 4) and all hearings and deadlines set forth therein are vacated, except that the parties shall exchange initial disclosures by 9/20/2022. (kmt) (Entered: 09/12/2022) |
| 09/16/2022 | 21 | MOTION to Dismiss by Bard Access Systems, Inc., C.R. Bard, Inc.. (Attachments: # 1 Exhibit 1) (Walker, Alex) (Entered: 09/16/2022) |
| 09/19/2022 | 22 | NOTICE OF WITHDRAWAL OF DOCUMENT by Kimberly Divelbliss (Lakins, Charles) (Entered: 09/19/2022) |
| 09/20/2022 | 23 | CERTIFICATE OF SERVICE by Bard Access Systems, Inc., C.R. Bard, Inc. *Initial Disclosures Pursuant to Rule 26(a)(1)* (Walker, Alex) (Entered: 09/20/2022) |
| 09/26/2022 | 24 | CERTIFICATE OF SERVICE by Kimberly Divelbliss *Initial Disclosures* (Lakins, Charles) Modified text on 9/27/2022 (arp). (Entered: 09/26/2022) |

| 09/30/2022 | 25 | NOTICE by Kimberly Divelbliss re 21 MOTION to Dismiss *of Extension of Time* (Lakins, Charles) (Entered: 09/30/2022) |
| 10/04/2022 | 26 | AMENDED COMPLAINT against All Defendants., filed by Kimberly Divelbliss. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Lakins, Charles) (Entered: 10/04/2022) |
| 10/07/2022 | 27 | RESPONSE to Motion re 21 MOTION to Dismiss filed by Kimberly Divelbliss. (Lakins, Charles) (Entered: 10/07/2022) |
| 10/18/2022 | 28 | MEMORANDUM OF LAW in Support of 21 MOTION to Dismiss *Plaintiff's First Amended Complaint* by Bard Access Systems, Inc., C.R. Bard, Inc.. (Walker, Alex) Modified text on 10/19/2022 (arp). (Entered: 10/18/2022) |
| 11/01/2022 | 29 | NOTICE by Kimberly Divelbliss *of Extension of Time* (Lakins, Charles) (Entered: 11/01/2022) |
| 11/11/2022 | 30 | NOTICE by Kimberly Divelbliss *of Extension of time to file responsive pleading* (Lakins, Charles) (Entered: 11/11/2022) |
| 11/21/2022 | 31 | RESPONSE in Opposition re 21 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by Kimberly Divelbliss. (Lakins, Charles) Modified to correct linkage on 11/22/2022 (bap). (Entered: 11/21/2022) |
| 11/28/2022 | 32 | NOTICE by Bard Access Systems, Inc., C.R. Bard, Inc. *Notice of Agreed Extension of Time for Defendants to File Responsive Pleading* (Walker, Alex) (Entered: 11/28/2022) |
| 12/19/2022 | 33 | REPLY to Response to Motion re 28 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by Bard Access Systems, Inc., C.R. Bard, Inc.. (Walker, Alex) (Entered: 12/19/2022) |
| 12/19/2022 | 34 | NOTICE of Briefing Complete by Bard Access Systems, Inc., C.R. Bard, Inc. re 28 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by Bard Access Systems, Inc., C.R. Bard, Inc. (Walker, Alex) (Entered: 12/19/2022) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 05/17/2023 16:37:35 | | |
| **PACER Login:** | brookemesner | **Client Code:** | TIVAD |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00601-DHU-KK |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**KIMBERLY DIVELBLISS**
     **Plaintiff,**

**v.**                                   **1:22-CV-00601-JHR-KK**

**BARD ACCESS SYSTEMS, INC.,**
**and C.R. BARD, INC.,**
     **Defendants.**

## FIRST AMENDED COMPLAINT FOR
## STRICT PRODUCTS LIABILITY, NEGLIGENT MISREPRESENTATION,
## FRAUD, FRAUDULENT CONCEALMENT,
## AND PUNITIVE DAMAGES

**THE PLAINTIFF Kimberly Divelbliss,** by and through counsel Lakins Law Firm, P.C., for her First Amended Complaint against Defendants for Strict Products Liability, Negligent Misrepresentation, Fraud, Fraudulent Concealment and for Punitive Damages, states as follows:

## JURISDICTION AND VENUE

1. This is an action for damages relating to Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying, and/or selling the defective device sold under the trade name of Bard PowerPort® isp M.R.I. Implantable Port (hereinafter "PowerPort," or "Defective Device").

2. This matter arises from the failure of a surgically-implanted medical device manufactured by Defendants sold under the trade name of Bard PowerPort® isp M.R.I Implantable Port (hereinafter "PowerPort").

3. Plaintiff Kimberly Divelbliss is a resident of Otero County, New Mexico.

4. Defendant Bard Access Systems, Inc. ("BAS") is an active foreign corporation, with its principal address in Salt Lake City, Utah, in good standing and licensed to do business in the

State of New Mexico, with its principal place of business in New Mexico located in Espanola, NM. BAS is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce its medical devices, including the PowerPort. BAS is a wholly owned subsidiary of Defendant C.R. Bard.

5. Defendant C.R. Bard, Inc. ("Bard") is a New Jersey Corporation with its principal place of business located in Murray Hill, New Jersey. Bard is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce its medical devices, including the PowerPort.

6. This matter was removed to the Federal District Court, District of New Mexico.

7. Venue and Jurisdiction is not disputed.

## FACTS
### Product Background

8. PowerPort is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by Defendants.

9. According to the BAS, the PowerPort is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

10. The intended purpose of the PowerPort is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

11. The PowerPort consists of two primary components: an injection port and a catheter. The injection port has a raised center, or "septum," where the needle is inserted for

delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, which is inserted into a blood vessel.

12. The PowerPort is "indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples."

13. According to BAS marketing materials, its Groshon "open ended central venous catheters continue to set the standard for performance and reliability," and are described as a "medical-grade radiopaque silicone construction [that] ensures biocompatiblity.

14. The catheter is comprised of a polymeric mixture of silicone and barium sulfate, a compound which is visible in certain radiologic studies.

15. Barium sulfate is known to contribute to reduction of the mechanical integrity of polymers *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of silicone.

16. Researchers have shown that catheter surface degradation in products featuring a radiopaque barium sulfate stripe is concentrated at the locus of the stripe.[1]

17. The surface integrity of barium sulfate-impregnated silicone catheter is affected by the concentration of barium sulfate as well as the homogeneity of the modified polymer.

18. As the barium sulfate content increases, medical polymer products that use barium sulfate begin to show losses of the base polymer's tensile strength and other mechanical properties.[2]

---

[1] See Hecker JF, Scandrett LA. *Roughness and thrombogenicity of the outer surfaces of intravascular catheter*s. *J Biomed Mater Res*. 1985;19(4):381-395. doi:10.1002/jbm.820190404.

19. Upon information and belief, Defendants' manufacturing process in constructing the catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles, leading to improperly high viscosity of the raw silicone before polymerization and causing improper mixing of barium sulfate particles within the silicone matrix.

20. This defect in the manufacturing process led to a heterogeneous modified polymer which included weakened areas of higher barium sulfate concentration and led to surface degradation of the catheter which, in turn, created multiple locations for the development of thrombotic material.

21. Although the surface degradation can be reduced or avoided with design modifications to encapsulate the radiopaque compound, Defendants elected not to incorporate those design elements into the PowerPort.

22. Defendants obtained "clearance" to market the PowerPort product implanted in Plaintiff under Section 510(k) of the Medical Device Amendments to the Food, Drug, and Cosmetic Act.

23. Unlike the rigorous pre-market approval requirements under the FDA, §510(k) permits the marketing of medical devices if the device is substantially equivalent to other legally marketed predicate devices without formal review for the safety or efficacy of the device. Section 510(k) reviews are completed in an average of 20 hours as compared to the 1200 hours necessary to complete a PMA review, and rarely elicit negative responses from the FDA. *See McDonald v Zimmer, Inc.,* 2020-NMCA-020, ¶ 11, 461 P.3d 930, citing to *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 479 (1996) ("Whereas the premarket review process (which requires 1,200 hours to complete) is a federal safety review, the on-average 20-

---

[2] See Tilak M. Shah, *Radiopaque Polymer Formulations for Medical Device*, March 1, 2000, Medical Device and Diagnostic Industry, https://www.mddionline.com/print/60.

4

hour review process for devices marketed under 510k "requires little information, rarely elicits a negative response from the FDA, and gets processed very quickly.")

24. Although implantable medical devices such as the PowerPort are ordinarily required to undergo a rigorous premarket approval process, the Medical Device Amendments Act of 1976, Pub. L. No. 94-295, 90 Stat. 539 (the Act), permitted devices that are "substantially equivalent" to devices already on the market to avoid the premarket approval process. *See* 21 U.S.C. § 360e(b)(1)(B) (2018). Courts have observed that this truncated route (known as the "510k process," under a prior version of the Act) is "focused on equivalence, not safety." *Medtronic, Id*, 518 U.S. at 493.

25. Once a product is cleared by the FDA under the §510(k), the manufacturer remains under an obligation to investigate and report any adverse events associated with the device and must periodically submit any new information to the FDA that may affect the agency's previous conclusions regarding safety and efficacy. This obligation extends to post-market monitoring of adverse events/complaints.

26. Pursuant to *Wyeth v. Levine*, 555 U.S. 555 (2009), once a product is cleared "the manufacturer remains under an obligation to investigate and report any adverse associated with the drug…and must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling …." This obligation extends to post-market monitoring of adverse events/complaints.

27. At all times relevant hereto, Defendants misrepresented the safety of the PowerPort system, and marketed, distributed, and sold the PowerPort system as a safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions and blood products.

28. At all times relevant hereto, Defendants knew, and had reason to know, that the PowerPort was not safe for the patients for whom they were prescribed and implanted, because once implanted, the device was prone to fracturing, migrating, perforating internal vasculature, precipitating thrombosis, and otherwise malfunctioning.

29. At all times relevant hereto, Defendants knew and had reason to know that patients implanted with a PowerPort had an increased risk of suffering life threatening injuries, including but not limited to: death, hemorrhage, cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart), cardiac arrhythmia and other symptoms similar to myocardial infarction, severe and persistent pain, and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

30. Soon after the PowerPort was introduced to the market, which was years before Plaintiff's PowerPort device was implanted, Defendants received large numbers of Adverse Event Reports (AERs) from healthcare providers, which reporting informed Defendants that the PowerPort was fracturing, migrating, and otherwise malfunctioning post-implantation, and that fractured pieces were traveling inside patient's bodies.

31. Years prior to the manufacture of the PowerPort device implanted in Plaintiff, Defendants were made aware, through the AER reports, that patients were suffering severe and life-threatening injuries, including hemorrhaging, heart attacks, sever pain, and tearing of blood vessels and organs.

32. Defendants also received large numbers of AERs reporting that PowerPort was found to have perforated internal vasculature. These failures were often associated with reports of patient injuries such as:

     a.     Hemorrhage;

b.      Cardiac/pericardial tamponade;

c.      Cardiac arrhythmia and other symptoms similar to myocardial infarction;

d.      Severe and persistent pain; and

e.      perforations of tissue, vessels and organs; and,

f.      upon information and belief, even death.

33. In addition to the large number of AERs which were known to Defendants and reflected in publicly accessible databases, there are thousands of recorded device failures and/or injuries related to the Defendants' implantable port products – including the product implanted in Plaintiff – which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

34. The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient advocacy groups.[3]

35. Prior to the discontinuation of the ASR program, Defendants reported thousands of episodes Prior to the discontinuation of the ASR program, Defendants reported thousands of episodes under the ASR exemption, thereby concealing them from physicians and patients.

36. Defendants were aware or should have been aware that the PowerPort had a substantially higher failure rate than other similar products on the market, yet Defendants failed to warn consumers - or medical providers - of this fact.

37. After becoming aware of the adverse outcomes in patients associated directly to the PowerPort device, Defendants did not warn patients, treating physicians or other healthcare providers about the risk of fracturing and migration of dislodged portions of the PowerPort device.

---

[3] Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Health News (Mar. 2019).

38. Defendants also intentionally concealed the severity of complications caused by the PowerPort and the likelihood of these events occurring.

39. Rather than alter the design of the PowerPort to make it safer or adequately warn physicians of the dangers associated with the PowerPort, Defendants continued to actively and aggressively market the PowerPort as safe, despite their knowledge of numerous reports of catheter fracture and associated injuries.

40. Moreover, Defendants' warnings suggested that fracture of the device could only occur if the physician incorrectly placed the device such that "compression or pinch-off" was allowed to occur. In reality, however, Defendants knew internally these devices were fracturing and causing serious injuries due to defects in the design, manufacturing and lack of adequate warnings.

41. The conduct of Defendants, as alleged in this Complaint, constitutes willful, wanton, gross and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff.

42. Defendants had actual knowledge of the dangers presented by the PowerPort System, yet consciously failed to act reasonably to:

    A. Adequately Inform or warn Plaintiff, her prescribing physicians, or the public at large of these dangers;

    B. Establish and maintain an adequate quality and post-market surveillance system; or

    C. Recall the PowerPort system from the market.

43. Despite knowing of a design and manufacturing defect in the PowerPort device, which created excessive risk in patients, Defendants did not change the design or manufacture of the device. Despite being aware of the significant failures of the PowerPort device through

the AER reports, Defendants took no action to warn medical providers or consumers of the known flaws in the PowerPort device.

44. Rather, Defendants suggested in written warnings that accompanied the device that fracture may occur only if the physician incorrectly implanted the device in a manner that cause it to compress or "pinch off."  At no time did Defendants disclose, even though they were aware, that such fracturing had already occurred in the absence of physician error.

45. There are thousands of recorded device failures and/or injuries related to the Defendants' implantable port products, including the product implanted in Plaintiff, which were concealed from medical professionals and patients through submission to the controversial Alternative Summary Reporting ("ASR") program.

46. The Defendants improperly hid the device failures in the ASR program when the reports should have been made through the publicly searchable MAUDE database.

47. Defendants were aware or should have been aware that the PowerPort had a substantially higher failure rate than other similar products on the market, yet the Defendants failed to warn consumers of this fact.

48. Defendants were aware of a design defect of the PowerPort device and took intentional action to conceal the design defect from the FDA and consumers.

49. Defendants were also ware of a manufacturing defect of the PowerPort device and took intentional action to conceal the design defect from the FDA and consumers.

50. Despite being aware of defects in the PowerPort devices manufactured by Defendants, Defendants intentionally concealed the severity of complications caused by PowerPort and the likelihood of these events occurring from both the FDA and consumers.

51. Rather than correct the design and manufacturing process of the PowerPort or to make it safer, or adequately warn physicians of the dangers associated with the PowerPort,

Defendants continued to actively and aggressively market the PowerPort as safe, despite their knowledge of design and manufacturing defects, and despite numerous reports of catheter fracture, migration, failure and injuries to numerous patients in which the PowerPort had been installed.

52. The conduct of the Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff. Defendants had actual knowledge of the dangers presented by the PowerPort System, yet consciously failed to act reasonably to:

   a. Adequately inform or warn Plaintiff, her prescribing physicians, the Food and Drug Administration, or the public at large of these dangers; and,

   b. Establish and maintain an adequate quality control procedure in the PowerPort manufacturing process; and,

   c. Establish and maintain an adequate quality and post-market quality control system to ensure the design, manufacturing and labeling deficiencies associated with the device were timely identified and corrected; and,

   d. Recall the known-defective PowerPort System from the market.

### Specific Factual Allegations as to Kimberly Divelbliss

53. A Bard Groshong MRI implantable injection port ("PowerPort") was surgically placed in Plaintiff Kimberly Divelbliss on July 13, 2017. The installed port was manufactured by Bard Access Systems. It is identified as Serial Number 1778001, Lot Number REAY1729.

54. The device was implanted by Plaintiff's surgeon, Dr. Uzodinma R. Dim, for ongoing treatment of common variable immunodeficiency disease.

55. The PowerPort was correctly and properly installed by Dr.. Dim, in accordance with the manufacturer's instructions.

56. The PowerPort device installed in Plaintiff was not installed in such a manner that would have caused it to compress or "pinch off."

57. The PowerPort was properly utilized by Plaintiff's treating physicians for treatment, strictly in accordance with the manufacturer's instructions.

58. At all times the PowerPort was used for its intended purpose of injecting medication into (or withdrawing blood from) Plaintiff, all medical personnel who provided treatment to Plaintiff properly followed the instructions for use of the PowerPort, including the requirement for use of certain sized needles.

59. Plaintiff and her health care providers used the PowerPort in a normal, customary, intended and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications into Plaintiff's bloodstream. Moreover, Plaintiff's health care providers did not place, maintain or use the device incorrectly such that it caused the device to malfunction.

60. On October 24, 2019, an x-ray was taken of Plaintiff's chest area, showing the location and condition of the PowerPort, prior to a routine follow up appointment with Dr. Dim. (Exhibit 1).

61. On October 25, 2019, Plaintiff was seen by Dr. Dim at the Las Palmas Medical Center in El Paso, TX as part of her routine follow up care.  The x-ray taken the prior day was of good image quality and showed no signs of pinch off.

62. On December 13, 2019, Kimberly Divelbliss presented to the emergency room in Alamogordo, NM with extreme chest pain, and found to have a broken piece of the

PowerPort catheter dislodged in her heart. She was immediately transferred by ambulance from Alamogordo to the Las Palmas Medical Center in El Paso, TX.

63. Ms. Divelbliss was required to undergo emergency surgery to remove the PowerPort. A more than 7-inch section of the broken catheter had detached and became lodged in her right atrium.

64. The location of where the catheter section broke is the same as is shown in the 10/24/2019 x-ray of a higher degree of radiopacity, which is consistent with a higher level of barium sulfate. (Exhibits 2 & 3).

65. The dislodged section of catheter directly, and irreparably, damaged the interior structure of Plaintiff's heart.

66. Due directly to the damage to Plaintiff's heart caused by the dislodged catheter, she has suffered from serious heart arrhythmias and was required to undergo several ablation surgeries. During each of these surgeries, Ms. Divelbliss must be awake, and each surgery results in her enduring phenomenal pain.

67. Ms. Divelbliss continues to suffer from heart arrhythmias due directly to the heart irreparable damage caused by the broken catheter.

68. Due to the defective device, Plaintiff suffered damages and continues to suffer damages including, but not limited to, undergoing an unnecessary major surgery, increased risk of future severe and permanent injuries, severe emotional distress, ongoing fear and anxiety from future injuries, including but not limited to, cardiac arrhythmias.

69. Defendants, directly or through their agents, apparent agents, and employees, designed, manufactured, marketed advertised, distributed and sold the PowerPort that was implanted in Plaintiff Kimberly Divelbliss.

70. The Defendants intentionally and knowingly concealed their knowledge of the propensity of the PowerPort catheter to fracture from Plaintiff and her physicians.

71. Defendants intentionally and knowingly concealed the dangerous propensity of the PowerPort device to fracture and migrate, necessitating surgical intervention. Defendants further intentionally concealed their knowledge of the cause of these failures, and that the failures were known to cause serious injuries.

72. The Defendants knowingly and intentionally concealed their knowledge of the PowerPort's faulty design and manufacturing, and the unreasonably dangerous risks associated with the faulty device from Plaintiff, her physicians and the FDA

73. Numerous reports of PowerPort catheter fracture, dislodgment, and/or thrombosis in the absence of physician error were recorded and reported BAS prior to prior to the implantation of the PowerPort in Plaintiff.

74. Despite knowledge of numerous reports of catheter failure. Defendants continued to actively and aggressively market the PowerPort as safe. BAS, with Bard's knowledge and consent, utilized marketing communications, including the Instruction for Use, and direct communications from sales representatives to Plaintiff's health care providers to intentionally misled her health care providers into believing the known fractures were caused only by physician error, and no fracturing occurred due to the chemical makeup of the catheter itself, despite knowing this to be exactly the case.

75. Defendants did not adequately warn Plaintiff or Plaintiff's physicians of the true quantitative or qualitative risk of catheter failure associated with the PowerPort.

76. Rather than correct the faulty design and manufacture of the PowerPort product to make it safer or warn physicians of the known dangers associated with the PowerPort, the

Defendants knowingly and intentionally chose to continue with their sales and marking efforts to sell their knowingly defective product to health care providers and patients such as Plaintiff.

77. Plaintiff's healthcare providers did in fact review the product insert Defendants distributed with the PowerPort prior to prescribing the product to Plaintiff

78. Plaintiff's physician relied upon the representations, including the instructions for use distributed with the PowerPort product implanted in the Plaintiff and the product advertising to Plaintiff's detriment.

79. The Defendants knowingly concealed the dangerous propensity of the device to dislodge and create a life-threatening medical condition, such as happened to Plaintiff.

80. As a result of the intentional actions of the Defendants (including their failures to notify the FDA, the medical profession and consumers), and the Defendants' wrongful conduct in designing, manufacturing, and marketing a known defective product, Plaintiff and Plaintiff's physician were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff would have been exposed to risks identified in this Complaint, and that those risks were the direct and proximate result of the Defendants' acts, omissions and intentionally and knowingly-made misrepresentations.

81. The Defendants failed to notify the FDA, the medical community and consumers of the known defects in the PowerPort device, and knowingly and intentionally withheld information about the known defects of the device, which were known to Defendants prior to the manufacture of the device that was implanted in Plaintiff.

82. The Defendants failed to conduct adequate and sufficient post-marketing surveillance after they began marketing, advertising, distributing and selling the PowerPort.

83. Due directly to the defective PowerPort, Kimberly Divelbliss has suffered damages and continues to suffer damages including, but not limited to, undergoing multiple surgeries, medical and hospital expenses, increased risk of future severe and permanent injuries, severe emotional distress, ongoing fear of and anxiety from future injuries, including but not limited to cardiac injuries. Accordingly, Plaintiff seeks compensatory damages.

## Count I
## Negligence

84. Plaintiff incorporates the preceding paragraphs as if set forth herein.

85. The Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling and conducting post-market surveillance of the PowerPort.

86. The Defendants failed to exercise due care under the circumstances and therefore breached this duty by:

    A. Failing to properly and thoroughly test the PowerPort before releasing the device to market, and/or failing to implement feasible safety improvements;

    B. Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the PowerPort;

    C. Failing to conduct sufficient post-market testing and surveillance of the PowerPort;

    D. Designing, manufacturing, marketing, advertising, distributing, and selling the PowerPort to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of the PowerPort and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

    E. Failing to exercise due care when advertising and promoting the PowerPort; and,

    F.   Negligently continuing to manufacture, market, advertise, and distribute the PowerPort after Defendants knew or should have known of its adverse effects.

87. As a direct and proximate result of the Defendants' actions, omissions and misrepresentations, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

88. In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice so as to justify an award of punitive and/or exemplary damages.

## Count II
## Strict Liability - Failure to Warn

89. Plaintiff incorporates the preceding paragraphs as if set forth herein.

90. Defendants designed, set specifications for, manufactured, marketed, distributed, and sold the PowerPort, including the one implanted into Plaintiff into the stream of commerce (including commerce in the State of New Mexico) and in the course of same, directly advertised and marketed the PowerPort to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

91. At the time Defendants manufactured, marketed, distributed, and sold the PowerPort device implanted into Plaintiff, Defendants were aware the device was defective and presented an unreasonably dangerous risk of injury to users of the product when put to its intended and reasonably anticipated use, namely as an implanted port/catheter system to administer the medications.

92. Information obtained from the publicly searchable MAUDE database reflects between August 2009 and July 2017, at least 251 adverse reports were entered into the MAUDE database, the large majority of which indicated breaks and fractures of the catheters manufactured by Defendants. (Exhibit 4).

93. The narrative of MAUDE reports from 8/3/2015, 2/3/2016, 4/28/2016, 12/12/2016 and 7/21/2017 (Exhibit 5 attached), reflect the known defective condition of the type of PowerPort surgically implanted into Plaintiff.

94. Defendants produced and distributed a document "PowerPort Implantable Port Instructions for Use." (Exhibit 6).

95. The "Instructions for Use" document (at pages 2- 4) includes a section "Contraindications, Warnings, and Precautions."

96. The "Instructions for Use" document (at page 4) includes thirty-three (33) "potential serious complications."

97. The "Instructions for Use" document (starting at page 4) includes a section titled "Preventing Pinch-Off."

98. The "Instructions for Use" document does not include any language referencing the known propensity of the catheter to fracture, dislodge and create a life-threatening medical condition, which Defendants were fully aware of.

99. Defendants knew or should have known at the time they manufactured, marketed, distributed, and sold the PowerPort that was implanted into Plaintiff that the PowerPort devices were fracturing and migrating for reasons other than "pinch-off" caused by the physician's incorrect initial placement of the device.

100.    Had Plaintiff's physician, Dr. Dim, been informed through the Defendant's "Instructions for Use" document that the PowerPort devices were fracturing and migrating

for reasons other than "pinch-off" caused by the physician's incorrect initial placement of the device, he would have had the opportunity to evaluate the implantation of the device with full knowledge of all risks and serious potential complications.

101. Prior to manufacturing the PowerPort device implanted into Plaintiff, Defendants knew the PowerPort devices were fracturing and migrating and causing patient injuries at much higher reported failure rates than had ever been revealed to or expected by consumers.

102. Defendants knew or should have known at the time they manufactured marketed, distributed, and sold the PowerPort device implanted into Plaintiff, that the PowerPort posed a significant and higher risk than other similar devices of device failure and resulting serious injuries.

103. Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the PowerPort; no reasonable health care provider, including Plaintiff's, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers or the consumers of the device.

104. No warnings, labels and instructions published and disseminated by Defendants were inaccurate, intentionally misleading, misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device, and failed to adequately indicate the known scope of the danger of using the device.

105. Defendants knowingly and intentionally failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities, and further failed to adequately provide instructions on the safe and proper use of the devic e.

106. The warnings, labels, and instructions provided by the Defendants at all time relevant to this action were inaccurate, intentionally misleading, and misinformed and

misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

107. The health risks associated with the PowerPort device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

108. At the time Defendants manufactured, marketed, distributed, and sold the PowerPort device implanted into Plaintiff, Defendants were aware that a substantial number of PowerPort devices sold by Defendants were defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use. Despite this knowledge, Defendants failed to provide a warning (much less an adequate warning) of the device's known or reasonably scientifically knowable dangerous propensities, and further failed to adequately provide instructions on the safe and proper use of the device.

109. Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the PowerPort to medical providers and the FDA, despite having full knowledge of the failures of the PowerPort, which resulted in the device presenting an unreasonably dangerous risk of injury to patients.

110. When the PowerPort device was implanted in Plaintiff, Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, which were known to Defendants.

111. The device, which was designed, manufactured, assembled and sold in the stream of commerce by Defendants, was defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

112. When the PowerPort device was surgically implanted into Plaintiff, Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as described herein.

113. Defendants intentionally underreported the number and nature of adverse events associated with fracture and migration of the devices to Plaintiff's health care providers, as well as the FDA

114. Due directly to Defendants' failure to report the known failures and medical risks associated with the PowerPort devices, which were known to Defendants for years prior to July 2017, neither Plaintiff nor her health care providers had any reason to know of the substantial danger associated with the defective device.

115. Had Defendants provided adequate warnings, Plaintiff and her physicians would not have used the PowerPort device.

116. Upon information and belief, the defective and dangerous condition of the device including the one implanted into Plaintiff, existed at the time they were manufactured, marketed, labeled, distributed, and sold by Defendants to distributors and/or healthcare professionals or organizations. Upon information and belief, the device implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

117. Defendants' lack of sufficient warnings and instructions created an unreasonably dangerous risk of injury and was the direct and proximate cause of Plaintiff's serious physical injuries; if Defendants had provided adequate warnings, Plaintiff and her physicians would not have used the device, as similar competitive devices existed at the time.

118.    Defendants' lack of sufficient warning and/or instructions was the direct and proximate cause of Plaintiff's serious physical injuries, and economic damages in an amount to be determined at trial. Plaintiff has suffered damages due directly to Defendants' failure to warn.

### Count III
### Strict Liability - Design Defect

119.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

120.    Defendants designed, set specifications for, manufactured, marketed, distributed, and sold the PowerPort, including the one implanted into Plaintiff into the stream of commerce (including commerce in the State of New Mexico) and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore are strictly liable for distributing a defectively designed product.

121.    The PowerPort implanted in Plaintiff was defective in its design and unreasonably dangerous at the time it left the control of Defendants and entered the stream of commerce; it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable, and because the foreseeable risks of the device devices exceeded any benefits associated with its use.

122.    At the time PowerPort implanted in Plaintiff was manufactured, safer alternative designs were commercially, technologically, and scientifically attainable and feasible.

123.    At the time Defendants manufactured, marketed, distributed, and sold the PowerPort device implanted into Plaintiff, Defendants were aware the design of the device was defective and presented a substantial danger to users of the product when put to its intended and reasonablyy anticipated use.

124. Plaintiff and her health care providers used the PowerPort in a manner that was reasonably foreseeable to Defendants and in the manner it was intended to be used.

125. Neither Plaintiff nor her health care providers could have by the exercise of reasonable care discovered the defective condition or perceived the unreasonable dangers with the PowerPort prior to the device being implanted into Plaintiff.

126. Defendants are strictly liable to the Plaintiff for designing, manufacturing, marketing and selling the defectively designed PowerPort implanted in Plaintiff.

127. The design defect of the PowerPort implanted into Plaintiff created an unreasonably dangerous risk of injury and was a direct and proximate cause of Plaintiff's serious physical injuries, and Plaintiff has suffered damages due directly to the design defect.

### Count IV
### Strict Liability - Manufacturing Defect

128. Plaintiff incorporates the preceding paragraphs as if set forth herein.

129. Defendants designed, set specifications for, manufactured, marketed, distributed, and sold the PowerPort, including the one implanted into Plaintiff into the stream of commerce (including commerce in the State of New Mexico) and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore are strictly liable for manufacturing a defective product.

130. Upon information and belief, the defective and dangerous condition of the device implanted into Plaintiff existed at the time it was manufactured by Defendants.

131. Based on information and belief, Defendants operated under design and manufacturing specifications for the PowerPort, which included appropriate material content, strength,

size, durability appearance, resistance levels, and the devices were not to be distributed if they exhibited excessive surface damage. The manufacturing process was intended to identify any end-product products that did not meet design specifications, so that those devices would not be placed into the stream of commerce.

132. Based upon information and belief, The PowerPort implanted in Plaintiff contained manufacturing defects when it left Defendants' possession. The device differed from said Defendants' intended result and/or from other ostensibly identical units of the same product line.

133. Upon information and belief, the PowerPort implanted in Plaintiff varied from its intended specifications in that the device did not have the specified material content, strength, size, durability, strength, and contained surface damage, pitting, or cracking on the exterior of the device which increased the risk of fracture and migration.

134. The device implanted in Plaintiff was in the same condition as when it was manufactured distributed and sold by Defendants.

135. The PowerPort device implanted into Plaintiff, which Defendants manufactured, marketed, distributed, and sold into the stream of commerce was defective at the time of its release into the stream of commerce.

136. Plaintiff and her health care providers used the PowerPort in a way that was reasonably foreseeable to Defendants.

137. The device's manufacturing defect created an unreasonably dangerous risk of injury and was the direct and proximate cause of Plaintiff's serious physical injuries and economic damages.

## Count V
## Negligent Misrepresentation

138.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

139.    Defendants distributed, marketed and provided the labeling and warning materials distributed with the PowerPort device that was implanted in Plaintiff.

140.    Prior to and on the dates Defendants distributed the PowerPort to Plaintiff *via* her health care providers, Defendants negligently and carelessly represented to Plaintiff, their health care providers, and the general public that certain material facts were true.

141.    The information distributed by Defendants to Plaintiff and her health care providers was in the form of reports, press releases, advertising campaigns, labeling materials, print advertisements commercial media containing material representations, and instructions for use.

142.    Upon information and belief Plaintiff's prescribing physicians reviewed these materials including specifically the labeling materials provided with these devices, prior to deciding to use the specific PowerPort device in Plaintiff.

143.    Prior to, on, and after the dates during which Plaintiff and her physicians purchased and used the PowerPort, said representations were not true, and there was no reasonable ground for believing said representations to be true at the times said representations were made.

144.    Prior to, on, and after the dates during which Plaintiff and her physicians purchased and used the device, Defendants intended that Plaintiff, her physicians, and the general public would rely on said representations and prescribe the PowerPort, which did in fact occur.

145. Defendants' fraudulent misrepresentations to Plaintiff's health care providers were a substantial factor in their decision to use this device in Plaintiff.

146. Defendants' misrepresentations were a substantial factor in causing Plaintiff's injuries and damages, as described herein.

## Count VI
## Fraud - Misrepresentation

147. Plaintiff incorporates the preceding paragraphs as if set forth herein.

148. At all times relevant to this cause, and as described herein, Defendants intentionally provided Plaintiff, her physicians, the medical community and the FDA with false or inaccurate information, and/or omitted material information concerning the PowerPort including, but not limited to, misrepresentations regarding the following topics:

    A. The safety of the devices;

    B. The efficacy of the devices;

    C. The rate of failure of the devices; and

    D. The pre-market testing of the devices.

149. The information distributed by Defendants to the public, the medical community, Plaintiff and her physicians, was in the form of reports, press releases, advertising campaigns, labeling materials, print advertisements, commercial media containing material representations, and instructions for use, as well as through their officers, directors, agents, and representatives. These materials contained false and misleading material representations, which included:

    A. That the devices was safe, fit, and effective when used for its intended purpose or in a reasonably foreseaable manner;

B. That the devices did not pose dangerous health risks in excess of those associated with the use of other similar devices;

C. That the device was safer and more effective than other available port devices.

150. Defendants made the foregoing misrepresentations knowing that they were false. These materials included instructions for use and a warning document that was included in the package of the device implanted in Plaintiff.

151. Defendants' purpose in making these misrepresentations was to deceive and defraud Plaintiff and her health care providers; to gain the confidence of Plaintiff and her health care providers; to falsely assure them of the quality of the device and its fitness for use; and to induce Plaintiff's healthcare providers to request, recommend, prescribe, implant, purchase, and continue to use the PowerPort, all in reliance on Defendants' misrepresentations.

152. The representations and omissions by Defendants were in fact false, and Defendants were at all times aware of the false nature of the representations.

153. Defendants acted to serve their own interests, and having reasons to know the misrepresentations were false, consciously disregarded the substantial risk that the device could significantly harm patients.

154. Plaintiff's healthcare providers did in fact review and rely on these written materials distributed by Defendants, including specifically the product inserts provides in the packaging of the PowerPort device, in respect to performing a risk/benefit analysis in determining whether or not to prescribe the PowerPort to Plaintiff. Plaintiff's health care providers also relied on these materials in determining what risk information to pass on to Plaintiff as part of the informed consent process.

155. In reliance upon the concealed information as well as the false representations made by Defendants, Plaintiff and her health care providers were induced to, and did use the PowerPort, thereby causing Plaintiff to sustain the injuries described herein.

156. Defendants knew that Plaintiff and her health care providers did not have the ability to determine the true facts intentionally concealed and misrepresented by Defendants and would not have prescribed and implanted this device in Plaintiff, if the true facts regarding the device had not been concealed and misrepresented by Defendants.

157. Defendants had sole access to material facts concerning the defective nature of the PowerPort and its propensity to cause serious side effects in the form of dangerous injries and damages to persons who are implanted with the device.

158. At the time Defendants failed to disclose and intentionally misrepresented the foregoing facts, and at the time Plaintiff's health care providers purchased and used this device, Plaintiff's health care providers were unaware of the these misrepresentations by Defendants.

159. Plaintiff's health care providers reasonably relied upon misrepresentations made by Defendants where the concealed and misrepresented facts were critical to understanding the true dangers the inherent in the use of the device.

160. Defendants' fraudulent misrepresentations to Plaintiff's health care providers were a substantial factor in their decision to use this device in Plaintiff.

161. Defendants' misrepresentations were a substantial factor in causing Plaintiff's injuries and damages, as described herein.

### Count VII
### Fraudulent Concealment

162. Plaintiff incorporates the preceding paragraphs as if set forth herein.

163.    In marketing and selling the PowerPort device, Defendants concealed material facts from Plaintiff and her health care providers.

164.    Defendants concealed material facts regarding the PowerPort including, but not limited to, the following:

    A.  That the devices were unsafe and not fit when used for their intended purpose or in a reasonably foreseeable manner;

    B.  That the devices posed dangerous health risks in excess of those associated with the use of other similar devices;

    C.  That there were additional side effects related to implantation and use of these devices that were not accurately and completely reflected in the warnings associated with the devices; and,

    D.  That the devices were not adequately tested to withstand normal placement within the human body.

165.    Plaintiff and her healthcare providers were not aware of these and other facts concealed by Defendants.

166.    Defendants are and were under a continuing duty to disclose the true character, quality and nature of the device that was implanted in Plaintiff, but instead they concealed them. Defendants' conduct as described herein, amounts to conduct purposely committed, which Defendants must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of Plaintiff.

167.    In concealing these and other facts, Defendants intended to deceive Plaintiff and her health care providers as to the true facts regarding the safety and efficacy of the PowerPort.

168.  Plaintiff's healthcare providers did in fact review the product insert Defendants distributed with the PowerPort prior to prescribing the product to Plaintiff.

169.  Plaintiff's health care providers reviewed and relied on these product inserts for the purpose of making a risk benefit assessment as to whether or not to prescribe the PowerPort. Plaintiff's health care providers also relied on these materials in determining what risk information to pass on to Plaintiff as part of the informed consent process.

170.  Plaintiff and her healthcare providers reasonably and justifiably relied on the above described concealments by Defendants.

171.  This concealment by Defendants of material facts from Plaintiff and her healthcare providers was a substantial factor in Plaintiff's health care providers deciding to use the devices and in Plaintiff's agreement to be implanted with the devices.

172.  Plaintiff's physician would not have prescribed the PowerPort to Plaintiff had Defendants not concealed the above-described information.

173.  Defendants' fraudulent concealment was a substantial factor in causing Plaintiff's injuries and damages, as described herein

### Count VIII
### Punitive Damages

174.  Plaintiff incorporates the preceding paragraphs as if set forth herein.

175.  Not only did Defendants intentionally fail to issue any warning regarding the known hazardous condition of the PowerPort device to the FDA, to the medical community and to patients, Defendants knowingly, intentionally and with conscious disregard for the health and safety of patients, including Plaintiff, concealed defects of the device that were known to Defendants from the FDA, from the medical community and from patients such as Plaintiff.

176.   Defendants intentionally and fraudulently misrepresented facts and information to both the healthcare community and the general public, including Plaintiff and her health care providers, by making intentionally false and fraudulent misrepresentations about the safety and efficacy of the PowerPort. Defendants intentionally concealed the true facts and information regarding the serious risks of harm associated with the implantation of said product, and intentionally downplayed the type, nature, and extent of the adverse side effects of being implanted with the device, despite Defendants' knowledge and awareness of the serious and permanent side effects and risks associated with use of same.

177.   Defendants further intentionally sought to mislead health care providers and patients, including Plaintiff and her health care providers, regarding the cause of fracture and migration failures of the device

178.   Defendants had knowledge of, and were in possession of evidence demonstrating that, the PowerPort caused serious physical side effects. Defendants continued to market said product by providing false and misleading information with regard to the product's safety and efficacy to the regulatory agencies, the medical community, and consumers of the device, notwithstanding Defendants' knowledge of the true serious side effects of the PowerPort, Defendants failed to provide accurate information and warnings to the healthcare community that would have dissuaded physicians from surgically implanting the PowerPort and consumers from agreeing to being implanted with the PowerPort, thus depriving physicians and consumers from weighing the true risks against the benefits of prescribing and implanting the PowerPort.

179. As a direct and proximate cause of Defendants' acts and omissions a described herein, and Plaintiff's implantation with Defendants' defective product, Plaintiff suffered, and will continue to suffer, the injuries and damages described in this complaint

180. The conduct of the Defendants was malicious, reckless, wanton and/or in bad faith.

181. Punitive damages should be awarded against Defendants.

### Jury Demand

182. Plaintiff demands a jury on all issues triable by jury.

**WHEREFORE**, Plaintiff Kimberly Divelbliss respectfully requests that the Court:

A. Enter Judgment against Defendants on all causes of action set forth in this First Amended Complaint; and,

B. Award Plaintiff compensatory damages, including for pain & suffering, emotional damages, loss of consortium and all other allowable damages, for each of her claims against Defendants, in an amount to be proven at trial; and,

C. Award Plaintiff damages for past, present and future medical expenses, in an amount to be proven at trial; and,

D. Award appropriate punitive damages against Defendants; and,

E. Award Plaintiff pre-judgment and post-judgment interest; and,

F. Award Plaintiff her reasonable attorneys fees and costs incurred as permitted under New Mexico law; and,

G. Enter such further relief as the Court deems just and appropriate.

Respectfully Submitted,
Lakins Law Firm, P.C.

_[signature]_

Charles N. Lakins, Esq.
PO Box 91357
Albuquerque, NM 87199
(505) 404-9377

### Certificate of Service

I, Charles N. Lakins, do hereby certify that on October 4, 2022 this *First Amended Complaint* was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

_[signature]_

Charles N. Lakins