# BEFORE THE UNITED STATES JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

|  |  |
| --- | --- |
| **IN RE: BARD IMPLANTED PORT CATHETER PRODUCTS LIABILITY LITIGATION** | MDL No. 3081 |

---

**DEFENDANTS BECTON, DICKINSON AND COMPANY, C.R. BARD, INC. AND BARD ACCESS SYSTEMS, INC.'S MEMORANDUM IN OPPOSITION TO THE MOTION TO TRANSFER ACTIONS PURSUANT TO 28 U.S.C. § 1407**

---

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ...............................................................................................................1

RELEVANT FACTUAL BACKGROUND............................................................................1

      A.      Bard's Implantable Ports are Safe and Effective Devices That Have Been
             Used by Medical Professionals for Decades..........................................................1

      B.      Defendants Have Efficiently Managed Past Implantable Port Litigation
             Without an MDL, and Will Continue to Do So with Respect to the
             Pending and any Future Actions..............................................................................5

      C.      The Eleven Pending Actions Involve Varied Alleged Complications,
             Individualized Causation Issues, and Different Devices ........................................7

      D.      Defendants Have Proposed Informal Coordination ................................................9

ARGUMENT .....................................................................................................................10

I.      Individualized Factual Issues Concerning the Devices and the Alleged Injuries
      Predominate and Negate Any Perceived Efficiencies of an MDL. ...................................10

II.     The Minimal Number of Actions Filed and Their Procedural Posture Weigh
      Against Centralization .......................................................................................................14

III.    Informal Coordination is Possible and Preferred................................................................17

IV.    Centralization of these Actions in the Western District of Missouri Would
      Advance Only the Interests of Movants' Counsel .............................................................18

CONCLUSION..................................................................................................................20

ME1 45266551v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Belviq (Lorcaserin HCl) Prod. Liab. Litig.*,
    555 F. Supp. 3d 1369 (J.P.M.L. 2021)....................................................................10, 12, 18

*In re: Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*,
    804 F. Supp. 2d 1376 (J.P.M.L. 2011)..........................................................................10

*In re Covidien Hernia Mesh Prod. Liab. Litig.*,
    481 F. Supp. 3d 1348 (J.P.M.L. 2020)...................................................................14, 15, 17

*In re CVS Caremark Corp. Wage and Hour Emp't Practices Litig.*,
    684 F. Supp. 2d 1377 (J.P.M.L. 2010)..........................................................................18

*In re Drowning Incident at Quality Inn Ne., Washington, D. C., on May 3, 1974*,
    405 F. Supp. 1304 (J.P.M.L. 1976)...............................................................................11

*In re: Hotel Booking Access for Individuals With Disabilities Litig.*,
    521 F. Supp. 3d 1361 (J.P.M.L. 2021)..........................................................................6, 17

*In re: Linear Gadolinium-Based Contrast Agents Prod. Liab. Litig.*,
    341 F. Supp. 3d 1381 (J.P.M.L. 2018)........................................................................12, 18

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*,
    959 F. Supp. 2d 1375 (J.P.M.L. 2013)........................................................................16, 18

*In re Qualitest Birth Control Prod. Liab. Litig.*,
    38 F. Supp. 3d 1388 (J.P.M.L. 2014)............................................................................18

*In re Raymond Lee Org., Inc. Sec. Litig.*,
    446 F. Supp. 1266 (J.P.M.L. 1978)..........................................................................10, 11, 14

*In re Stivax Mktg. & Sales Pracs. Litig.*,
    __ F. Supp. 3d __, 2022 WL 17843106 (J.P.M.L. Dec. 12, 2022).........................................14

*In re Xytex Corp. Sperm Donor Prod. Liab. Litig.*,
    223 F. Supp. 3d 1351 (J.P.M.L. 2016)............................................................................11

**Statutes & Regulations**

21 C.F.R. § 880.5965 ..................................................................................................1, 2

21 U.S.C. § 360(k) ......................................................................................................2, 3, 4

28 U.S.C. § 1407(a) ................................................................................................1, 10, 11

ME1 45266551v.1

# INTRODUCTION

Defendants Becton, Dickinson & Company, C.R. Bard, Inc., and Bard Access System, Inc. (collectively, "Defendants" or "Bard") respectfully submit this Memorandum in opposition to this Motion to Transfer Actions. This Motion arises from a coordinated attorney advertising campaign soliciting cases related to Bard's totally implantable venous access devices. Since their introduction about two decades ago, Bard has a proven track record of safety and efficacy in connection with the implantable port devices identified in this Motion, which facilitate the administration of chemotherapy and other life-saving treatments to hundreds of thousands of patients each year. In addition, Bard has a proven track record of effectively managing the modest litigation that has occurred with these devices over the years without formal consolidation. Nothing in Movants' application warrants departure from the ordinary litigation process, and Movants have failed to establish that transfer of these eleven actions is convenient for the parties and witnesses, and that it will promote the just and efficient conduct of these actions. 28 U.S.C. § 1407(a). The Panel should deny this Motion.

## RELEVANT FACTUAL BACKGROUND

### A.  Bard's Implantable Ports are Safe and Effective Devices That Have Been Used by Medical Professionals for Decades

Bard's implantable ports are FDA-cleared Class II totally implantable venous access devices indicated for patient therapies requiring repeated access to the vascular system. *See* 21 C.F.R. § 880.5965. Totally implantable venous access devices have allowed millions of patients to receive chemotherapy, antibiotic therapy, parenteral nutrition and other life-sustaining treatment without the need for repeated, painful needle pricks that can cause serious damage to veins. Totally implantable venous access devices are offered for sale by a number of different manufacturers, and have provided an important means of venous access for critically ill patients since the 1980s.

1

Of the eleven pending actions, ten concern devices sold under the tradename "PowerPort." PowerPorts not only allow for infusions of medication and other therapies, but also allow for the power injection of contrast media for contrast-enhanced CT scans. In 2006, Bard introduced the first of its PowerPort family of devices. The eleventh action concerns a non-power-injection port sold under the tradename "BardPort." BardPort devices have been on the market for more than two decades.

PowerPorts, like all totally implantable venous access devices, consists of two primary components: an injection port with a self-sealing silicone septum and a radiopaque catheter. *See* Ex. A (Specification Sheet); Ex. B, at 1 (IFU). The injection port is generally implanted under the skin in the lateral region of the chest below the clavicle. *See* Ex. B, at 1-4. A catheter connected to the injection port is tunneled under the skin to an insertion point in a vein. *Id.* at 4-5. The tip of the catheter is advanced from its insertion point to the junction of the superior vena cava and the right atrium of the heart where the medication or fluids are introduced via injection from the port. *Id.*

Importantly, "PowerPorts" consist of a number of devices with differing designs and configurations of injection ports and catheters that have been the subject of seven different premarket submissions to FDA pursuant to the 510(k) process, 21 U.S.C. § 360(k). There are presently eight "families" of PowerPort devices that, in turn, are comprised of dozens of configurations identifiable by assigned product codes or SKU numbers:



*See* Ex. A. The various configurations include injection port bodies of different shapes and materials, among other differences.

There are also different available catheter options, such as the Chronoflex™ and Groshong™ catheters that were allegedly implanted in the plaintiffs in these actions. *See* Ex. A. Chronoflex™ catheters are open-ended, polyurethane catheters, while Groshong™ catheters are closed-tip, silicone catheters with end-valves for fluid flow. Silicone and polyurethane catheters have different physical and chemical properties. As such, these catheters are subject to different design and specifications to ensure biodurability and biocompatibility. Chronoflex™ and Groshong™ catheters also differ in their concentration of barium sulfate, a radiopaque substance that allows it to be seen on diagnostic imaging such as x-ray, CT or MRI.

Additionally, a medical practitioner's vein selection for catheter insertion subjects the device to various anatomical conditions. For example, as commonly explained in the different Instructions for Use that accompany these devices, medical professionals are advised to avoid the risk of "pinch-off" syndrome. *See* Ex. B, at 1-3. Pinch-off occurs when the catheter becomes compressed between the clavicle and first rib, and the catheter severs as a result. *Id.* PowerPorts are contraindicated for catheter insertion in the subclavian vein medial to the border of the first rib. To prevent pinch-off, the IFUs advise practitioners to use the lateral subclavian vein or the internal jugular vein for catheter insertion. *Id.* The IFU also instructs physicians to avoid bending catheters during implantation, which "can compromise catheter patency." *Id.* at 3. Other factors may impact performance and wear, including but not limited to, how well the device is maintained. Bard's implantable ports, like other totally implantable venous access devices, must be properly maintained in order to minimize the risk of clot formation, blockage, and infection by regularly flushing the port and catheter with a specific saline solution depending on the type of catheter.

As with all totally implantable venous access devices, there are known risks of complication. Plaintiffs in the underlying actions complain of infection, thrombosis (blood clots),

fracture or breakage, and catheter embolism (migration). Importantly, all of these risks, which are associated with all totally implantable venous access devices, are clearly delineated in the IFUs for PowerPorts and in the medical literature:

**Possible Complications**

The use of a subcutaneous port provides an important means of venous access for critically ill patients. However, the potential exists for serious complications, including the following:

| | | |
|---|---|---|
| · Air Embolism | · Endocarditis | · Perforation of Vessels or Viscus |
| · Allergic Reaction | · Extravasation | · Pneumothorax |
| · Bleeding | · Fibrin Sheath Formation | · Risks Normally Associated with Local |
| · Brachial Plexus Injury | · Guidewire Fragment Embolism | or General Anesthesia, Surgery, and |
| · Cardiac Arrhythmia | · Hematoma | Post-Operative Recovery |
| · Cardiac Puncture | · Hemothorax | · Spontaneous Catheter Tip Malposition |
| · Cardiac Tamponade | · Hydrothorax | or Retraction |
| · Catheter or Port Erosion Through | · Infection, including but not limited to, pocket, | · Thoracic Duct Injury |
| the Skin | catheter tunnel, and/or blood stream | · Thromboembolism |
| · Catheter Embolism | · Inflammation, Necrosis, or Scarring of | · Vascular Thrombosis |
| · Catheter Occlusion | Skin Over Implant Area | · Vessel Erosion |
| · Catheter or port-related Sepsis | · Intolerance or Reaction to | |
| · Damage or Breakage due to Compression | Implanted Device | |
| between the Clavicle and First Rib | · Laceration of Vessels or Viscus | |
| · Device Rotation or Extrusion | · Pain at or around port pocket site | |

These and other complications are well documented in medical literature and should be carefully considered before placing the port.

*Id.*[1] In the event of a complication, minimally invasive treatment is typically sufficient, and where a port must be removed, it is very common for a new port *of the same make and model* to be implanted. Thrombolytic agents and antibiotics can be used to successfully treat occlusions and infections, respectively.[2] Catheter fracture and migration, which are rare complications, are typically addressed by retrieving the distal end of the catheter intravenously via guidewire and snare without the need for anesthesia in most cases.[3]

---

[1] Bard cites to the IFU identified in *Divelbliss v. Bard Access Sys., Inc.*, No. 22-CV-00601 (D.N.M.), which was the first filed action and only one of the four cases in eleven total in which plaintiffs properly identified the device at issue. Although Bard's implanted ports are not subject to a single IFU, Bard's IFUs have uniformly warned of the risk of infection or sepsis, thrombosis, catheter embolism, and damage or breakage.

[2] *See* Thromboyltic therapy for central venous catheter occlusion, Hameatologica 97(5), 641–650. (May 2012); Clinical Practice Guidelines for the Diagnosis and Management of Intravascular Catheter-Related Infection: 2009 Update by the Infectious Diseases Society of America (2009).

[3] *See* Spontaneous fracture and migration of catheter of a totally implantable venous access port via internal jugular vein – a case report, J. of Cardiothoracic Surgery (2016) 11:50.

ME1 45266551v.1

Given the minimally invasive and successful treatment options for addressing complications, it is unsurprising that litigation rarely results from a complication. And importantly, there has not been any landmark scientific studies questioning the overall safety profile of Bard's implantable ports. Nor have there been any FDA-issued recalls,[4] or other regulatory action taken by FDA related to PowerPort safety (such as warning letters or public health notifications).

**B.     Defendants Have Efficiently Managed Past Implantable Port Litigation Without an MDL, and Will Continue to Do So with Respect to the Pending and any Future Actions**

Although Movants emphasize "the ubiquity of implanted port implantations in the United States," there are only eleven (11) pending actions. Mot. at 2. Indeed, there has only been eleven other actions involving Bard's port devices filed in the five years preceding this Motion. *See* Cert. of Counsel ¶ 5. Critically, Bard efficiently resolved those previously filed cases, without an MDL. *Id.* ¶¶ 6-9. Movants do not point to any fact warranting deviation from the normal litigation process.

Product liability litigation concerning Bard's implantable ports has been limited and pursued by only a few attorneys. Indeed, Movants' counsel in more than half of the pending actions, Adam Evans, was involved in the majority of the previously filed and resolved actions.[5] *See id.* ¶ 7. At one point, nine cases were simultaneously pending in nine different district courts spanning from California, to Indiana, to Georgia. *See id.* ¶ 6. Eight of those cases were filed by a single law firm. Defendants were able to coordinate discovery in those cases with plaintiffs' counsel and Mr. Evans without the need for any formal consolidation or centralization of cases. *Id.* ¶ 8.[6] *Id.* All

---

[4] There have been eight voluntary limited product recalls since 2015 involving certain lots of PowerPort devices, which is the earliest date that any of the plaintiffs had their port implanted. None of these small-scale recalls relates to Movants' allegations regarding catheter composition, nor do Movants argue that they are in anyway related to their claims.

[5] At the time of the prior cases, Mr. Evans was affiliated with the Brenes Law Group, P.C. In or about May 2022, Mr. Evans joined his current firm Dickerson Oxton, LLC.

[6] After these eight cases were resolved, two additional cases were filed shortly before the expiration of the applicable statutes of limitation. These cases were voluntarily dismissed

cases resolved prior to the exchange of expert disclosures. All cases, except one, resolved without taking a single deposition. *Id.* All cases resolved within one month to thirty-one months of filing, with an average duration of about eighteen months. *Id.* ¶ 9.

There is no indication that the parties will not be able to coordinate, efficiently litigate, and successfully resolve the now-pending actions as they have done in the past. Indeed, Movants advance the same theory of liability in the pending actions as Mr. Evans did in the prior actions: that Defendants' radiopaque agent, barium sulfate, is allegedly "known to reduce the material integrity of the catheter when it is not encapsulated, coated or otherwise separated from the catheter surface," which in turn can lead to complications. (*Compare* Mot. at 3 *with Duff v. C.R. Bard, Inc.*, Am. Compl. ¶¶ 18-23, No. 20-cv-60, ECF No. 20 (W.D. Ky. June 22, 2020) (alleging that "Defendants' manufacturing process . . . involved too high a concentration of barium sulfate particles" and that Defendants elected not to incorporate "design modifications to encapsulate the radiopaque compound").[7]

As discussed, no precipitating event spurred the newly filed actions. Instead, the principal driver for the eleven pending actions is counsel's intent to form an MDL in his home jurisdiction, the Western District of Missouri. In December 2022, Mr. Evans contacted Defendants to discuss port litigation, and advised Defendants that he was running a targeted digital advertising campaign with a consortium of other law firms with an eye towards filing an MDL application. Cert. of Counsel ¶ 10. At the time, there was only one pending action (not filed by Movants' counsel),

---

immediately upon Defendants' filing of motions to dismiss. The parties resolved the eleventh action shortly after pre-answer motion practice and the exchange of limited, core discovery.

[7] In fact, Mr. Evans filed at least five complaints in 2021 alleging identical theories of product defect related to the use of barium sulfate against another manufacturer of implantable venous access devices and did not move for formation of an MDL. *See, e.g.*, *Mora v. AngioDynamics, Inc.*, Compl. ¶¶ 28-31, No. 21-cv-10234, ECF No. 1-1 (D. Mass Feb. 11, 2021)).

ME1 45266551v.1

*Divelbliss v. Bard Access Sys., Inc.*, No. 22-CV-00601 (D.N.M.), which was subject to a fully briefed motion to dismiss.

This coordinated digital advertising campaign has resulted in several internet websites such as portcatheterlawsuit.com, which is hosted by Mr. Evans' law firm, that misrepresent the safety and efficacy of Bard's products by asserting recklessly that "patients with Bard implanted port devices may be at a higher risk of serious complications or injury due to the device." Cert. of Counsel ¶ 11, Ex. C. Other websites have already latched onto the filing of this Motion as part of their efforts to solicit new cases, falsely representing that "[d]esign problems with the Bard PowerPort have been linked to reports of serious injury," and that "Bard PowerPort settlements may become available." *Id.* Importantly, though, this targeted advertising campaign has not resulted in a cascade of newly filed actions. Despite this advertising campaign, only eleven actions have been filed in the last year. Nothing in Movants' application suggests that a wave of future cases is imminent, and the Panel should not credit any assertion regarding future filings.

## C.     The Eleven Pending Actions Involve Varied Alleged Complications, Individualized Causation Issues, and Different Devices

The pending actions all have unique characteristics that weigh against centralization. Different medical providers implanted different ports into each plaintiff between 2015 and 2022 for the delivery of vital medications to treat pre-existing medical conditions. Those plaintiffs allegedly experienced distinct complications, prompting medical intervention.[8]

Five of the eleven actions purportedly involve "infections"—a risk that is explicitly disclosed in Bard's IFUs for these devices and that is otherwise attendant to all medical procedures. These five actions involve at least three different devices implanted over a seven-year period and

---

[8] Movants are eight of the ten plaintiffs listed in the Motion. Defendants have removed an eleventh action from a state court. *See* Schedule of Actions, ECF No. 14-1.

only one of the five plaintiffs identifies the product code and the lot number in her Complaint. As for the specific factual allegations, common issues do not predominate given the significant variation as to when the infection occurred, the type of infection at issue, and the devices at issue. Further, more than half of these cases are facially barred by the statute of limitations, and another case raises a statute of limitations issue that may be able to be confirmed once plaintiff produces her medical records.[9] Ordinary litigation and informal coordination among the overlapping plaintiffs' counsel is appropriate for these cases.

Five of the eleven actions allege catheter fractures. These actions involve five different devices, are pending in four different jurisdictions, and involve fact-specific causation issues. For example, some of these cases allege insertion of the catheter through the right subclavian vein where the risk of pinch-off may be greater, while other cases allege insertion through the internal jugular vein.[10] And despite being pleaded as a "fracture" case, medical records produced in *Kelley*

---

[9] Movant Groves (W.D. Mo.) received a "Bard PowerPort® M.R.I Implantable Port" in November 2015. Less than a month later, she allegedly suffered an infection. Movant, by her counsel Danielle Rogers and Roman Balaban, filed her Complaint more than three years *after* the statute of limitations expired. Movant Beltz (W.D. Mo.) received a "Bard PowerPort ClearVue MRI Port" in July 2017. About six months later, she allegedly suffered an infection. Movant, by her counsel Adam Evans, filed her Complaint three months *after* the statute of limitations expired. Movant Elwell (D. Kan.) received a "Bard PowerPort ClearVue Implantable Port" in January 2015. Six years later, she allegedly suffered an infection. Movant, by her counsel Adam Evans and Roman Balaban, filed her Complaint four months *after* the statute of limitations expired. Movant Nelk (D.N.J.) received a "Bard PowerPort ClearVue Implantable Port" in February 2021. About two weeks later, she allegedly suffered an infection. Movant, by her counsel Adam Evans and Roman Balaban, filed her Complaint on the eve of the expiration of the statute of limitations.

[10] *Prentice* (D. Ariz.) ("BardPort M.R.I Implantable Port"); *Kelley* (W.D. Mo.) ("Bard PowerPort ClearVue ISP Implantable Port"); *Divelbliss* (D.N.M.) ("Bard PowerPort® isp M.R.I Implantable Port"); *Cabello* (D.N.J.) ("Bard Groshong© MRI implantable injection port"). The final case was not initially pleaded as a fracture case. In her initial pleading, Movant Cunningham (W.D. Mo.) alleged that she received a "Bard PowerPort M.R.I. Implantable Port," and that nearly three years later, she was allegedly suffered an infection. Movant, by her counsel Adam Evans, filed her Complaint just one week before the latest date that the statute of limitations would expire. In response to Bard's Motion to Dismiss, Movant Cunningham filed an Amended Complaint pursuant to Rule 15(a)(1)(B) and entirely changed the facts of her case: She now alleges that she suffered a

indicates that the catheter detached at the port following her breast reconstructive surgery, and therefore, did not "fracture." Because each of these actions may turn on whether the alleged fracture was the result of pinch-off or how the device was implanted, the subsequent maintenance of the implanted device, and plaintiffs' underlying medical treatment, these actions can be litigated in the ordinary course as Defendants have done in the past.

The final case alleges thromboembolism. The facts of this case are readily distinguishable from the pending actions given the type of alleged complication and the short time-period between insertion of the device and the occurrence of that complication.[11] In addition, the complaints allege injuries from different catheters: eight cases involve the insertion of polyurethane Chronoflex™ catheter, while three cases involve the insertion of a silicone Groshong™ catheter.

## D.    Defendants Have Proposed Informal Coordination

Although Defendants oppose formation of an MDL, they remain open to informal coordination. In response to Movants' request for a stay of all proceedings pending this Motion, Defendants have proposed that the parties proceed with pre-answer motion practice in each case and the exchange of "core" discovery: (1) Initial Disclosures; (2) plaintiffs' port-related treatment records (i.e., implant and explant records and any medical procedures related to the alleged complications); (3) Defendants' existing Medical Device Reports ("MDRs") to the FDA for each plaintiff; (4) the applicable 510(k) submissions; and (5) certain device-specific design documents.

---

catheter fracture—not an infection—and that the catheter was inserted in the right internal jugular vein—not the subclavian vein. Bard respectfully submits that the Panel should interpret this about-face by Movants' counsel for what it truly is: disinterest in vetting the substance of each case given the focal interest in boosting case numbers for this Motion.

[11] Movant Terry (W.D. Mo.) allegedly received a "Bard PowerPort ClearVue Implantable Port" in March 2022. Less than three weeks later in April 2022, Movant was admitted to the hospital for concerns of thrombosis.

ME1 45266551v.1

Cert. of Counsel ¶ 16, Ex. D. As discussed, nothing in this Motion or pleaded in the present actions suggest that the parties' past success with informal coordination cannot be replicated here.

## ARGUMENT

Section 1407 prescribes that "civil actions involving one or more common questions of fact . . . may be transferred to any district for coordinated or consolidated pretrial proceedings . . . upon [the Panel's] determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Particularly in light of Defendants' track record of efficiently managing and resolving these actions without the need for centralization, Movants "bear a strong burden to show that the common questions of fact are so complex and the accompanying discovery so time-consuming that Section 1407 transfer would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *In re Raymond Lee Org., Inc. Sec. Litig.*, 446 F. Supp. 1266, 1268 (J.P.M.L. 1978). Movants fall woefully short of making that showing. Individualized issues will overwhelm the efficiencies, if any, to be gained from centralization.

The Panel has also stated that "centralization under Section 1407 should be the *last solution* after considered review of all other options." *In re: Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011) (emphasis added). Informal coordination is a "practicable" alternative that will minimize any inconveniences to the parties or witnesses (i.e., cross-noticing depositions). *In re Belviq (Lorcaserin HCI) Prod. Liab. Litig.*, 555 F. Supp. 3d 1369, 1370-71 (J.P.M.L. 2021).

## I.     Individualized Factual Issues Concerning the Devices and the Alleged Injuries Predominate and Negate Any Perceived Efficiencies of an MDL.

"The existence of common questions of fact between actions is . . . but one condition precedent to transfer under Section 1407. Before a transfer will be ordered, the Panel must be

satisfied that all the statutory criteria have been met." *In re Drowning Incident at Quality Inn Ne., Washington, D. C., on May 3, 1974*, 405 F. Supp. 1304, 1306 (J.P.M.L. 1976) (internal citation omitted). Accordingly, it is not enough to just identify common questions of fact. The common issues must predominate over the highly individualized issues specific to each plaintiff to render centralization appropriate. *See* 28 U.S.C. § 1407(a); *In re Xytex Corp. Sperm Donor Prod. Liab. Litig.*, 223 F. Supp. 3d 1351, 1352 (J.P.M.L. 2016) (denying motion for centralization because "the[] common factual questions [did not] predominate over the plaintiff-specific factual and legal questions presented in these actions"). In other words, the common questions of fact must be "so complex . . . that Section 1407 transfer would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *In re Raymond Lee Org., Inc. Sec. Litig.*, 446 F. Supp. at 1268.

Movants do not come close to meeting this standard. They merely identify certain high-level "common questions" that are attendant to every products liability action involving a medical device: whether plaintiffs have established causation, and "whether Defendants acted negligently in the design, testing, manufacture, sale of these devices, whether Defendants should be strictly liable for injuries caused by these devices, and whether Defendants failed to satisfy their duty to warn healthcare providers of the risks posed by these products." Mot. at 8. Setting aside their conclusory allegations, the only commonality among plaintiffs is their theory of liability: that "the design of the catheter components of Defendants' products are rendered unreasonably dangerous by a common design element, and that said unreasonably dangerous condition caused Plaintiffs' injuries." Mot. at 7. That sweeping statement does not withstand scrutiny however, and Plaintiffs wholly fail to explain how "Centralization of the Actions will Minimize the Risk of Inconsistent Rulings." *Id.* at 6 (capitalization in original).

11

The individualized issues are abundant and predominate over those common questions. *See*

*In re: Linear Gadolinium-Based Contrast Agents Prod. Liab. Litig.*, 341 F. Supp. 3d 1381, 1382

(J.P.M.L. 2018) (finding that "movants have failed to demonstrate that any common questions of

fact and law are sufficiently complex or numerous to justify centralization" and noting that "the

injuries alleged in each case appear to be highly plaintiff-specific"). Movants seek to form an MDL

(1) involving disparate complications (fracture versus infection versus thrombosis) (2) caused by

a number of different devices (which Plaintiffs have failed to adequately identify) (3) that allegedly

occurred over a significantly different time period. These individualized factual issues "diminish

the potential to achieve significant efficiencies in an MDL" because the parties may be required

to, among other things, engage in product-specific discovery in each case, seek significant third-

party discovery from the relevant medical providers, and retain specialized experts. *In re Belviq*

*(Lorcaserin HCI) Prod. Liab. Litig.*, 555 F. Supp. 3d at 1370 (denying motion for centralization

where "individualized factual issues concerning causation will predominate and diminish the

potential to achieve significant efficiencies in an MDL").

Analysis of the pending actions evidences their lack of amenability to centralization.

Discovery and trial in a catheter fracture action, such as *Divelbliss*, which involves the alleged

fracture of a silicone Groshong catheter two-and-a-half years after implantation, will look very

different than discovery and trial in *Nelk,* which involves the alleged occurrence of a bloodstream

infection two weeks after implantation of a polyurethane Chronoflex catheter.

Discovery in *Divelbliss* will require fact-specific expert opinions from the parties on the

proper implantation and maintenance of the PowerPort over the two-year period to rule-in and

rule-out alternative causes of the alleged fracture, such as pinch-off or subpar maintenance of the

device. There will also be fact-specific expert discovery regarding Ms. Divelbliss's contention that

her silicone Groshong catheter was defectively designed. Specifically, she contends that her catheter allegedly fractured two-and-a-half years after implantation at the location of a "radiopaque barium sulfate stripe" as a result of "improper mixing of barium sulfate particles within the silicone matrix." *Divelbliss v. Bard Access Sys., Inc.*, No. 22-cv-601, Compl. ¶¶ 16, 20, 64, ECF No. 26 (D.N.M.).

In contrast, fact and expert discovery in *Nelk* will be focused predominately on (1) whether sterile practices were followed by her medical providers, and (2) whether the barium sulfate in her polyurethane Chronoflex catheter "dissociated from the surface of the catheter" in just eleven days following implantation so as to create a "roughened catheter surface" and cause her "bloodstream infection." *Nelk v. Becton, Dickinson & Co.*, No. 23-cv-1173, Compl. ¶¶ 25, 30, 40-41, ECF No. 1 (D.N.J.). The trier-of-fact's highly fact-specific findings as to the existence of a fracture-related design defect and causation in *Divelbliss* will be of no moment to the trier-of-fact's determination in *Nelk*.

This same line of reasoning extends to the infection cases. From what can be discerned from the complaints that actually identify the infection at issue (most do not), Movants have not shown that centralization will minimize the risk of inconsistent rulings or promote the efficient conduct of these actions. For example, Movant Groves alleges that she developed "Staph Aureus Bacteremia, a blood infection[,] . . . [as] a result of seepage from the defective PowerPort catheter" less than a month after implantation of the port. *Groves v. Becton, Dickinson & Co.*, Compl. ¶¶ 60-61, No. 23-cv-6058, ECF No. 1 (W.D. Mo.). Movant Anderson, on the other hand, alleges that he "developed a fungemia infection" more than eighteen months after implantation of the port. *Anderson*, Compl. ¶¶ 40-41, No. 23-cv-316, ECF No. 1 (W.D.Mo.). Movants make no showing as

to how centralization of these actions involving disparate fact patterns will be convenient to anyone other than Movants' counsel who are pushing for the formation of this MDL.

Nor is there sufficient commonality with respect to issues related to Defendants' products and conduct. Movants fail to explain whether there are commonalities among the varied devices identified in the underlying Complaints, which identify eight different variations of devices and involve different catheters.

Lastly, Movants fail to carry their "strong burden" of "show[ing] that . . . the accompanying discovery [will be] so time-consuming that Section 1407 transfer would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *In re Raymond Lee Org., Inc. Sec. Litig.*, 446 F. Supp. at 1268. This is particularly true in these circumstances given the common discovery that the parties were able to efficiently exchange and coordinate in the prior actions and the fact that all prior cases over the last five years resolved without expert disclosures, and all, except one action, resolved without a single deposition.

For these reasons, these actions lack sufficient common questions of fact such that centralization would serve the convenience of the parties or promote the just and efficient conduct of this litigation.

## II. The Minimal Number of Actions Filed and Their Procedural Posture Weigh Against Centralization

"The Panel has repeatedly stated 'where only a minimal number of actions are involved, the moving party generally bears a heavier burden of demonstrating the need for centralization.'" *In re Stivax Mktg. & Sales Pracs. Litig.*, __ F. Supp. 3d __, 2022 WL 17843106, at *1 (J.P.M.L. Dec. 12, 2022) (quoting *In re Transocean Ltd. Secs. Litig. (No. II)*, 753 F. Supp. 2d 1373, 1374 (J.P.M.L. 2010)). Such is the case here. The low number of pending actions weigh against centralization, and Plaintiffs have failed to carry their heavy burden of proving otherwise. *In re*

*Covidien Hernia Mesh Prod. Liab. Litig.*, 481 F. Supp. 3d 1348, 1349 (J.P.M.L. 2020) (denying centralization of twelve actions pending in nine districts).

Relatedly, the Panel should reject Movants' reliance on the likelihood of future filings. The Panel has repeatedly reiterated that it is "'disinclined to take into account the mere possibility of future filings in [its] centralization calculus.'" *Id.* (quoting *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 959 F. Supp. 2d 1375, 1376 (J.P.M.L. 2013)). That admonition is apt here in light of Movants' unsupported prediction that "thousands (and possibly tens of thousands) of similar follow-on cases are likely to be filed" in the future. Mot. at 9. As discussed, there has been no precipitating event that will lead to a wave of new litigation after decades of these devices' safe and effective use to administer lifesaving medications.

Plaintiffs cannot rely on the FDA's election to formally end its Alternative Summary Reporting ("ASR") program in June 2019,[12] or the unrelated cited journal article published in January 2021 evaluating purported long-term complications associated with unidentified port-a-catheters to suggest that future filings are imminent.[13] Mot. at 3-4. To the contrary, the low number of actions filed since these events underscores the lack of a need for an MDL.

---

[12] Defendants dispute any suggestion that their lawful submission of data through the FDA's ASR program was in any way improper. Under the ASR program, "manufacturers of certain devices could request an exemption from the requirement to file individual medical device reports for certain events that were well-known and well-established risks associated with a particular device and to instead submit quarterly summary reports of such events." FDA, Press Release, *Statement on agency's efforts to increase transparency in medical device reporting* (June 21, 2019). According to FDA, "[t]he ASR Program allowed the FDA to more efficiently review reports of well-known, well-understood adverse events, so [it] could focus on identifying and taking action on new safety signals and less understood risks." *Id.*

[13] Defendants further dispute the inference drawn by Movants from the cited journal article that port devices, and Bard's in particular, have a high complication rate. In the article, there is no mention of Bard devices and no mention that barium sulfate or any other design feature had anything to do with the complications reported. The study explicitly acknowledges its limitations including that the data reviewed "does not allow for control of individual variabilities such as surgeon expertise, procedural methods, and follow-up and treatment protocols, or any insight into

ME1 45266551v.1

The Panel's analysis in *In re: Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 959 F. Supp. 2d at 1376, is on point:

> Although plaintiffs suggest that the number of Lipitor cases is likely to expand considerably, we are disinclined to take into account the mere possibility of future filings in our centralization calculus. That is particularly true here. Lipitor came to market in the late 1990's, and is one of the best-selling prescription drugs of all time. Virtually all the complaints in these actions cite a label change for the drug—as well as other statins—informing patients that increases in blood sugar levels had been reported with statin use. That label change, however, occurred in February 2012. Yet, more than a year later, only a relative handful of actions have been brought actually alleging a link between an individual's ingestion of Lipitor and the development of her type 2 diabetes.
>
> As always in this type of litigation, a highly individualized inquiry is necessary to determine whether any particular plaintiff developed type 2 diabetes as a result of taking Lipitor. Where few cases are filed, the balance tips toward allowing the regular litigation process to resolve those cases.

So too here. Bard's implantable ports have been on the market for two decades, and the plaintiffs in these actions all allege the occurrence of complications that are disclosed in the IFUs for these devices. Only a handful of actions have been filed in the four years since the FDA's withdrawal of the ASR program and the two years since the publication of the cited journal article. Given the highly individualized inquiry necessary to determine the cause of an infection, fracture, or

---

patient selection criteria. Various clinical factors, including but not limited to agents infused, heparin flushes, and systemic anticoagulation, are all variables that may further discern differences in complication rates within this cohort that we were unable to assess." S.I. Khalid, et al, *Outcomes following port-a-catheter placement in Medicare population*, Surgery Open Science 3 (2021) 39, 42. Contrary to the Khalid article that claims that 59% of the patients in that study experienced "any complication" with unidentified "port-a-catheter" devices, another study of patients implanted only with Bard M.R.I. Implantable Ports with open end 8 French polyurethane single lumen venous catheters found the "overall complication rate is consistent with data reported by several studies that range between 2 to 14.4%." Granziera et al., *Totally implantable venous access devices: retrospective analysis of different insertion techniques and predictors of complications in 796 devices implanted in a single institutio*n, BMC Surgery 2014, 14:27

thrombus and the low number of cases, the parties can and should rely on the regular litigation process and informal coordination.

Finally, the Panel has stated that "a history of early dismissals and settlements 'suggests that the advantages centralization typically affords—i.e., reducing duplicative discovery and motion practice, etc.—may not be relevant.'" *In re Hotel Booking Access for Individuals With Disabilities Litig.*, 521 F. Supp. 3d 1361, 1362 (J.P.M.L. 2021) (quoting *In re: ArrivalStar S.A. Fleet Mgmt. Sys. Patent Litig.*, 802 F. Supp. 2d 1378, 1379 (J.P.M.L. 2011)). Early dismissals and settlements has been the norm in the past implantable port litigation. Indeed, none of the previously filed cases by Mr. Evans or others over the last five years proceeded to expert disclosures, and only one case proceeded to deposition.

In sum, Movants have failed to carry their burden of demonstrating that centralization is appropriate here.

## III. Informal Coordination is Possible and Preferred.

As the Panel has stated in the past, "[t]he presence of common counsel here should facilitate informal coordination of this relatively small number of actions." *In re Covidien Hernia Mesh Prod. Liab. Litig.*, 481 F. Supp. 3d at 1349 (citing *In re Cymbalta (Duloxetine) Prods. Liab. Litig.*, 65 F. Supp. 3d 1393, 1394 (J.P.M.L. 2014)). Here, Movants' counsel Adam Evans, with whom Defendants have previously litigated and successfully coordinated pending actions without centralization, represents plaintiffs in more than half of the pending actions. Mr. Evans has also advised Defendants that he is coordinating with other counsel, which is also reflected in the fact that he is co-counsel with Balaban Law, LLP and Ratzan Weissman & Boldt in certain cases. In addition, defense counsel is the same for all actions.

These considerations, including the fact that all of these actions are in their early stages, weigh against centralization. *See In re: Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod.*

ME1 45266551v.1

*Liab. Litig.*, 959 F. Supp. 2d at 1376 (denying centralization where "many of the actions involve common plaintiffs' counsel"; and defendants agreed "to appropriately coordinate any common discovery or other pretrial matters across the cases"); *In re Linear Gadolinium-Based Contrast Agents Prod. Liab. Litig.*, 341 F. Supp. 3d at 1382 ("[P]laintiffs in most actions are represented by a single law firm or firms that are working as co-counsel with that firm in other related actions. . . . Given the significant overlap in plaintiffs' counsel, alternatives to transfer exist that may minimize whatever possibilities there might be of duplicative discovery and/or inconsistent pretrial rulings."); *In re Belviq (Lorcaserin HCI) Prod. Liab. Litig.*, 555 F. Supp. 3d at 1370–71 (stating that informal coordination is "practicable" and likely "to minimize duplicative discovery through cooperative efforts" where "[a]ll actions are in their early stages"). To the extent that Movants' counsel state in their reply that they have a number of retained additional claimants who have not yet filed suit, voluntary coordination remains "a preferable alternative to centralization." *In re Qualitest Birth Control Prod. Liab. Litig.*, 38 F. Supp. 3d 1388, 1389 (J.P.M.L. 2014) (stating that, notwithstanding counsel's representation that "there are 113 additional claimants that have not yet filed suit," voluntary coordination remained a preferable alternative to centralization given that those "potential plaintiffs would be represented by movants' counsel").

## IV.     Centralization of these Actions in the Western District of Missouri Would Advance Only the Interests of Movants' Counsel

The Panel has taken into account whether "a Section 1407 motion appears intended to further the interests of particular counsel more than those of the statute." *In re CVS Caremark Corp. Wage and Hour Emp't Practices Litig.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010). Following Mr. Evans' call with Defendants in December 2022, Movants' counsel have been true to their word in seeking to file actions (many of which are plainly barred by the applicable statute of limitations and filed in improper venues) in an effort to tee up this Motion. The only connection

18

to Missouri is that it is the home state of some of Movants' counsel and certain plaintiffs. Despite Defendants' lack of any specific connection to the Western District of Missouri, Movants nonetheless seek to centralize all actions in that district.

The Panel should deny centralization for the reasons stated in this Memorandum. In the event that the Panel finds centralization to be warranted, the Western District of Missouri is not the appropriate transferee district given its lack of connection to Defendants' contacts.[14] Instead, Defendants respectfully request the Panel centralize and transfer the pending actions to either the District of Utah or the District of Arizona.

The District of Utah is an appropriate transferee court. Bard Access Systems is the principal manufacturer and distributor of Defendants' implantable ports, and is a Utah corporation with a principal place of business in Utah. A significant number of relevant witnesses and documents are located at Bard Access Systems' headquarters in Salt Lake City. No MDL is currently pending in that district, as opposed to the now five MDLs pending in the Western District of Missouri. The District of Arizona is also an appropriate transferee court. Bard Access Systems, Inc. has a significant business presence in Arizona where a number of prospective witnesses work out of Defendants' facility in Tempe, Arizona. Notably, the Honorable David G. Campbell effectively oversaw an MDL to completion related to C. R. Bard, Inc.'s inferior vena cava ("IVC") filter

---

[14] In the event that the Panel orders transfer to the Western District of Missouri, Defendants respectfully submit that the Honorable Brian C. Wimes is not an appropriate selection for the transferee judge. Judge Wimes may need to recuse himself from the pending actions due to Defendants separately retaining Shook Hardy & Bacon, LLP as local counsel, where Judge Wimes daughter is now working as a summer law clerk. Defendants intend to address this issue with His Honor and Movants' counsel separately. Furthermore, Judge Wimes was recently assigned another MDL by the Panel. *See In re: T-Mobile 2022 Customer Data Security Breach Litig.*, MDL No. 3073, ECF No. 59 (assigning MDL to Judge Wimes and noting that His Honor is separately presiding over MDL No. 3019).

ME1 45266551v.1

products that at one point had more than 8,000 cases pending in the District of Arizona. *See In re: Bard IVC Filters Prods. Liab. Litig.*, No. 2:15-md-2641 (D. Ariz.).

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request the Panel deny this Motion to Transfer Actions.

Dated: June 16, 2023                    By: */s/ Edward J. Fanning*

**McCARTER & ENGLISH, LLP**
Edward J. Fanning
Wilfred P. Coronato
Christopher A. Rojao
Ryan M. Savercool
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Telephone: (973) 639-8486
Fax: (973) 624-7070
efanning@mccarter.com

*Attorneys for Defendants,*
*Becton, Dickinson and Company, C.R. Bard, Inc.,*
*and Bard Access Systems, Inc.*

ME1 45266551v.1