Pages 1 - 24

UNITED STATES JUDICIAL PANEL

on

MULTIDISTRICT LITIGATION

IN RE: BARD IMPLANTED PORT CATHETER ) MDL No. 3081
PRODUCTS LIABILITY LITIGATION        ) San Francisco, California
_____)

Thursday, July 27, 2023

**TRANSCRIPT OF PROCEEDINGS**

**BEFORE THE HONORABLE:**

**KAREN K. CALDWELL**
United States District Court
Eastern District of Kentucky

**NATHANIEL M. GORTON**
United Sates District Court
District of Massachusetts

**DALE A. KIMBALL**
United States District Court
District of Utah

**MATTHEW F. KENNELLY**
United States District Court
Northern District of Illinois

**ROGER T. BENITEZ**
United States District Court
Southern District of California

**MADELINE COX ARLEO**
United States District Court
District of New Jersey

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
          Official Reporter, U.S. District Court


     (Appearances, next page)

**APPEARANCES**:

For Plaintiffs Cunningham, Anderson, Terry, Nedved and Barnes:

DICKERSON OXTON, LLP
1100 Main Street
Suite 2550
Kansas City, Missouri  64105
**BY:  ADAM M. EVANS, ESQ.**


For Defendants:

MCCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey  07102
**BY:  EDWARD J. FANNING, ESQ.**

**Thursday, July 27, 2023**                              **10:06 a.m.**

**P R O C E E D I N G S**

**JUDGE CALDWELL:**  The Panel will now turn to MDL No. 3081.  First, we will hear from Mr. Adam Evans.

**MR. EVANS:**  Thank you, Your Honor.  And may it please the Panel.  My name is Adam Evans.  I'm an attorney at Dickerson Oxton in Kansas City, and I represent plaintiffs Cunningham, Anderson, Terry, Nedved and Barnes.

In addition to those plaintiffs, I also represent literally hundreds of individuals with claims against this defendant, related to the implanted port product that's manufactured by the defendant.  Those hundreds of defendants will likely be filing suit in the foreseeable future.  And I am one of a large and growing number of attorneys who are currently actively evaluating these cases, in significant volume.  So the case numbers are going to continue to grow, and precipitously so.

There was a notice of related actions filed this morning, bringing the overall case count at the moment to approximately 48 cases across 20 different states, and involving approximately 15 different law firms.

Leaving aside the fact for a moment that the defendant has rejected every actual attempt at informal coordination which would actually make a difference, at these numbers, informal coordination is just not workable.  With this number of cases

and the number of expected cases to come, the geographic distribution of the cases, and the number of different law firms involved, the implausibility of informal coordination only grows with every single case that's filed.  And like I said, they will continue into the future.

As an $81 billion market cap company, the defendant is no stranger to economies of scale.  And the reality is that the defendants' suggestions for what they call informal coordination are incredibly efficient for them, but entail unfathomable cost in terms of time, labor, money, which would be borne almost exclusively by plaintiffs, and by the federal judiciary.  Centralization is really the only way at this point in time to prevent that kind of unnecessary costly duplication of litigation efforts and burden on the courts.

And contrary to the defendant's venue suggestions, the Western District of Missouri is the best venue for transfer of these cases, from a cost and efficiency standpoint.

Regardless of where any defendant maintains their principal place of business, the reality today is that the discovery phase of this litigation will be conducted principally by electronic means, and depositions will be taken mostly by remote means.  As a result, there's just no important nexus to where a defendant has its principal place of business.  And as a result, where venue really does actually matter in terms of cost savings are things like the travel of the

participating counsel.

And the fact of the matter in this case is that a substantial proportion of the law firms involved and will be substantively involved in this case are in the Western District of Missouri, and this is an opportunity to do right by the plaintiffs by being good stewards of the common benefit expense funds that will be ultimately borne by plaintiffs in the event of a resolution.

Thank you.

**JUDGE CALDWELL:** Questions for counsel?

You may.

**JUDGE KENNELLY:** So I think the count as of this morning is 47 or something like that, just a little south of 50.

**MR. EVANS:** That's right.

**JUDGE KENNELLY:** So how many of those are -- is your firm the plaintiffs' counsel, of the actual filed cases, as of now?

**MR. EVANS:** Those five that I mentioned.

**JUDGE KENNELLY:** Just the five.

**MR. EVANS:** I'm local counsel in two other cases.

**JUDGE KENNELLY:** Got it.  Okay.  all right.  Thanks.

**JUDGE CALDWELL:** Other questions?

(No response)

**JUDGE CALDWELL:** Hearing none, you've reserved a

minute for rebuttal.

Daniel Rogers?  No, no, no, sorry.

Mr. Fanning?  Did I get that right?

**MR. FANNING:**  Daniel Rogers is a great lawyer, but he's no Ed Fanning.

**JUDGE CALDWELL:**  I don't know who should be insulted.

**MR. FANNING:**  Good morning, Your Honor.  My name is Edward Fanning.  I'm with McCarter & English, and I represent the defendants.  And we are here in opposition to the plaintiffs' motion to transfer.

Our clients' PowerPort products have been on the market for nearly two decades, and they have a proven track record of safety and efficacy.

Unlike other applications for transfer that have come before this Panel, and where transfer has been granted, there is no precipitating event here.  There is no FDA-ordered recall; there is no FDA warning letter; there is no public health advisory or other regulatory action involving our client's products.

What we have instead is a coordinated plaintiff-attorney advertising campaign in an effort to drum up claims and to -- to eventually get here and ask this Panel for centralization. We know that, because movants' counsel told us that that's what they would do.

When movants' counsel approached us back in December, he

said that if we weren't willing to capitulate at that point in time, a number of things would happen:  The attorney advertising would proliferate.  And it has.  Cases would be filed in different districts in support of this application here today.  And obviously, that's happened.

And he also told us that he was focused on creating exposure for the company in ways that matter, and that normally do not exist, to use his words.  He mentioned the possibility of reaching out to hospitals and healthcare systems to tell them that there was a problem with our client's products.  And unfortunately, that has happened.

I've not seen letters from Mr. Evans, himself, but we've seen letters from other plaintiffs' attorneys directed to hospitals, making dangerously false statements about our client's product, saying things like:  FDA strongly urges that anyone with a Port-A-Cath have it replaced as soon as possible.  That's a false statement.  FDA is not saying that.  They're not saying anything of that sort.

But that creates false alarm among healthcare providers, and that has a serious negative consequence on public health.  And I submit respectfully that that type of conduct should not be rewarded.  But if this panel grants transfer, that type of conduct will have been rewarded.

Now, Mr. Evans talked about informal coordination.  The fact is, we've had port litigation before.  In fact, we've had

port litigation with Mr. Evans before.  He was involved in eight of the 11 cases that we had involving this product line, leading up to 2023.  And he's obviously central here.  He's involved with all of the plaintiffs' attorneys, even though he's entered appearances in only some, we know, because he's told us that he's working with all of the plaintiffs' lawyers that are involved here.

Those cases that we had with him before 2023 all resolved without any expert disclosure, without any need for expert disclosures or reports, without any need for depositions in all but one case.  And they all resolved within 18 months.  Far quicker than we could expect with an MDL.

We know that these plaintiffs' attorneys are working together.  They had a seminar here yesterday in San Francisco, where they described themselves as a virtual law firm, who are all coordinating.  We've proven that we can informally coordinate with them.  And we ask the Panel to give us a chance to do so here.

There are other reasons why transfer is not appropriate here.  Those include the highly-individualized nature of each one of these cases that don't lend themselves to the efficiencies that you might get from an MDL.

But I refer to our papers on that, and we ask that the Panel give us the opportunity for informal coordination, and deny this motion.

**JUDGE CALDWELL:**  Yes, Judge Kennelly.

**JUDGE KENNELLY:**  So, I mean, respectfully, if we were to say that -- if we were to carve out of MDL creation any case in which there's attorney advertising and any cases in which plaintiffs' lawyers talk to each other, honestly, we might as well fold up our tents and all go back to our day jobs, because we wouldn't have any.

So is there something special about this one?  I mean, you've got 47 cases now; it's pretty clear you're going to get more.  Do you think it's going to make a difference one way or the other, as to whether there's an MDL or not?

**MR. FANNING:**  Judge, you know, I'm glad you asked. Because this morning, at 5:00 a.m., I woke up and got the notification of the 25 additional cases and notice of related action.  And we've actually had a chance to look at those.

And I submit that you can't take those numbers at face value.  Those do not represent legitimate cases that will survive even bare minimal scrutiny.

We've looked at them.  And at least 12, just on the face of the complaint, from the very limited plaintiff-specific description, they are barred by statute of limitations, for instance.

We've got one case that --

**JUDGE KENNELLY:**  In other words, the injury manifested itself long enough ago that the person would have had to sue

before now.

**MR. FANNING:**  Correct.  We've got one where the port was removed for infection in 2014, so that's nine years ago.  Actually, there's two in that category.  There's another where the port was removed 14 years ago, and still another where the port was removed 15 years ago.  And we've only scratched the surface.

So, Judge, I submit that you can't just take the numbers that are in front of you as representative of what is really at issue in this litigation, and --

**JUDGE KENNELLY:**  Right, but my question was really kind of more focused on whether MDL, yes, no, is going to make a difference in that.

**MR. FANNING:**  In terms of case numbers?

**JUDGE KENNELLY:**  Right.

**MR. FANNING:**  I think it's been proven, Judge, I mean, if you look at it statistically that if this Panel declines to grant transfer and does not form an MDL, there will not be an explosion of cases.  It just won't happen.

I mean, that's borne out by the statistics, if you look at the history of applications that are either granted or denied.  There's a wide disparity.  And where it's not granted, the litigation does not explode in that way.

**JUDGE KENNELLY:**  Okay.

**JUDGE ARLEO:**  So let me follow up on the questioning

about you look at -- we got the email at 5:00 in the morning. And some of these cases you take a quick look at, and say they are time-barred.

Shouldn't one judge be deciding those issues?  Could there be discovery rule issues?  Could there be discovery needed to tell if it's time-barred, or when they learned about the -- the alleged harm?

In other words, they're not just going to go away. They've been filed.  They're not going to magically disappear because the defendant thinks they're weak or they're not sustainable.  A judge is going to have to decide those issues.

Doesn't it make sense to have one judge decide it?

**MR. FANNING:**  I don't think so, Judge, because those turn on state-specific rules with respect to statute of limitations and, for instance, if there is a discovery rule. And I think it makes sense for the judges who deal with those issues in their home districts all the time to decide that.

**JUDGE ARLEO:**  But there's a lot of overlap between discovery rule jurisprudence from state to state.  One judge is going to look -- if there's all these old cases and they were discovery rule cases, doesn't it make sense for one judge to be looking at it, rather than --

**MR. FANNING:**  I don't think so.

**JUDGE ARLEO:**  Because they're not going to go away. So, we look at a case that gets filed, we take it at its worth

that ethical lawyers file legitimate claims.  Some issues can be disputable.  And some claims get dismissed.  But they have -- they don't just disappear.

So the fact that there are what you say are weak cases in some ways, like, militates in favor of coordination because there's going to be more litigation and discovery over those claims than claims where there's not a skepticism about the legitimacy of the claim.

**MR. FANNING:**  Judge, I think for judicial economy purposes and for purposes of clearing cases that don't belong, and letting cases that do have merit proceed, the best way to do that is to let those cases be resolved by the judges that they're in front of.

I think, you know, where you have situations -- and, again, history proves this point -- that, you know, where an MDL is formed, cases like those will just fly under the radar. They'll be parked in an MDL, you know, until the very end. Until there's some type of global resolution, for instance. And so the best, most economical and efficient way to deal with those is to let the judges that have those cases and know their states' law decide them.

They're not hard decisions.  I mean, based upon the information that we have in these complaints, those can be decided on pre-answer motions, for instance.

**JUDGE ARLEO:**  Well, maybe.  Maybe not.

**JUDGE BENITEZ:** Counsel, you're making some assumptions that may or may not be true, right?  So right now you have 47 cases, in how many different districts?

**MR. FANNING:** Judge, I haven't had a chance to calculate those.  I think it's somewhere around 28, but I don't know -- I've not had a chance to go through all of that this morning.

**JUDGE BENITEZ:** So, I'm not that sharp, but I'm trying to figure out how it is that it's more efficient for your client to litigate some of these issues in 28 different districts than it is to have one single judge decide these issues all at once.

It seems to me that it would be more efficient for your client to get these things decided, you know, by one judge, rather than having 28 different judges decide these issues.

**MR. FANNING:** Well, respectfully, Judge, I think there's two parts to the informal coordination and the efficiency, when you -- when you -- when you don't engage in the last resort of an MDL.

I've talked about and you heard from movants' counsel that there is commonality on the plaintiffs' side.  You know, we have -- defense counsel, we represent our client in all of these cases.

**JUDGE BENITEZ:** Uh-huh.

**MR. FANNING:** So we have the same players on our side

talking to the same players on their side.  So that makes informal coordination of issues like discovery very easy and efficient, regardless of where the cases are pending.

In terms of motion practice, for instance, again I think it's most efficient because, you know, the issues that are raised as threshold issues -- viability of claims, whether it be statute of limitations or, you know, substantive law -- those issues are best decided by judges who live with those issues and know that law, because they -- they apply it every day in their home districts.  So our client believes that that's the most efficient way to resolve these cases, and it's not through an MDL.

And as I said, you know, we've had -- we've proven that through informal coordination in the past.  We've resolved, you know, the history of litigation involving this product over the years very efficiently and very quickly.  You know, 18 months from start to finish, on average.  That's far quicker than we would ever see in an MDL.  With all respect to an MDL judge, there's just a lot of issues that get tied up in that, and it takes a long time to sort through them and resolve an MDL.

So we think the most efficient way to resolve these cases is to leave them where they are, and let us coordinate them informally.

**JUDGE BENITEZ:**  Thank you.  You've done an excellent job presenting your clients' case.

**JUDGE KIMBALL:** If I understood your argument, you expressed a willingness to coordinate in these matters are existing. But, has there been any coordination yet in the existing cases?

**MR. FANNING:** We have had -- in the existing cases so far, Judge, we've had three Rule 26 meet-and-confers, two of them with Mr. Evans's firm. Those have gone very smoothly. We have been able to come up with discovery plans in those cases, without any issue. We have provided a proposed protective order, discovery confidentiality order.

And as I said, we are willing to engage in informal coordination, as we have done in the past. You know, things like potentially sharing written discovery in cases involving the same product and product combination, cross-noticing depositions. You know, discussing the possibility of using transcripts of depositions that were taken in the past as though they had been taken in a particular case in this litigation.

So we're open to all that, and we've had success doing that, in the past.

**JUDGE BENITEZ:** But, I'm lost. If, in fact, the coordination has been working so well, why is plaintiff asking for us to centralize?

**MR. FANNING:** Because they think it gives them leverage, Your Honor. Because they think, you know, it'll lead

to an interest from third-party-litigation funders, because it will lead to more and more cases being filed.

You know, you've heard:  If you build it, they will come. I don't want to rehash that with this Court.  But that's, in my view, why they're making a push for the MDL here.

**JUDGE BENITEZ:**  All right, thank you.

**JUDGE CALDWELL:**  Yes.

**JUDGE KENNELLY:**  You didn't want to get into it with us.  But that's kind of been your whole presentation, right? If you build it, they will come?

And I've just got to say:  Time has proven?  I mean, there's no scientific study on any of that stuff.  There's no -- I mean, it's all anecdotal.  Somebody says:  Well, I have this MDL filed; now I've got a thousand cases.  No scientific study that you can cite of any of that, where people have done a controlled comparison.  It's anecdotal.  And it's usually from people who have a position one way or the other.

**MR. FANNING:**  That -- that analysis has been done, by organizations like Lawyers for Civil Justice.  Those statistics have been collected, Your Honor.  So I --

**JUDGE KENNELLY:**  Right.  But, I mean, as defense lawyers always tell me in these cases:  Correlation is not causation.  Right?

Just because you see it in a couple of different cases doesn't mean that's why.  Just --

**MR. FANNING:**  Respectfully, Your Honor --

**JUDGE ARLEO:**  These are not academic studies.

**JUDGE KENNELLY:**  You said you didn't want to raise the point, but, I mean, that was your whole argument up to now.

**MR. FANNING:**  Respectfully Your Honor, I think that history does support that position.  I understand Your Honor's position, but I think it does.

**JUDGE ARLEO:**  Well, they're not academic studies, number one, are they?

**MR. FANNING:**  No.

**JUDGE ARLEO:**  They're just not.  And they're not peer-reviewed studies; they're just studies done by advocates.  And causation is everything.  There are some legitimate -- that everyone would agree are very legitimate claims.  And after an MDL is filed, more claims come in.

And the issue is:  Are they coming in because they become an MDL, or not because of an MDL?  And that has not been studied, and certainly hasn't been peer-reviewed.  It's just anecdotal.

**MR. FANNING:**  Your Honor, we have the history that we have.  I mean, has there been a scientific peer-reviewed study of that phenomenon?  No.

But, you know, I -- I point the Court only to, you know, what history has shown us in terms of, you know, whether thumbs up or thumbs down on granting an MDL application by the Panel,

over -- over -- over the course of years.

**JUDGE ARLEO:**  And there's also been MDLs that we've -- we've formed, where no additional cases get filed after they're formed.  So doesn't that cut against your argument?

**MR. FANNING:**  I think that would be the -- the exception, Your Honor.

**JUDGE CALDWELL:**  Mr. Fanning, let me move from whether or not the matter should be centralized.  But if, indeed, it is, then where should it go?

I see you advocate for Utah or Arizona.  Would you like to give us some information on your position?

**MR. FANNING:**  I would, Your Honor.

Again, we do oppose centralization transfer.  But if the Panel is inclined to form an MDL, the Western District of Missouri, which is the venue that plaintiffs have all advocated for, is not the appropriate transferee district.  It has no connection to the product at issue.  There's already four MDLs pending in that district.

You know, when we think about what makes the most sense in terms of venue, we think of it from the point of view of the witnesses, where are they located.

Our client, Bard Access Systems, is the principal manufacturer and distributor of these products.  They are a Utah corporation, with their principal place of business in Utah.  A significant number of witnesses and documents are

located there in Salt Lake City, which is just as easily accessible as any major metropolitan area in the United States. You know, there's no MDL, as far as we know, currently pending in that district.

As for the District of Arizona, that also has a connection to our client.  Bard Access Systems has a significant business presence in Tempe, Arizona, and a number of company witnesses work out of that location.

So when we talk about, you know, if you're going to form an MDL where should it be, it shouldn't be just where the movants' counsel is located, and has filed most of his cases. That has no connection to the product or the company.  And it's convenient for no one, except movants' counsel.

So --

**JUDGE BENITEZ:**  What about the argument that this product is manufactured in Mexico?  Doesn't that cut against your argument to do this in Arizona or in Utah?

**MR. FANNING:**  I don't think so, Judge Benitez, because the plaintiffs' theories of liability here don't have to do with manufacturing defect.  They're not saying that something went wrong in the manufacturing process.

What they're focused on is the design of the product in terms of its material composition, and things of that nature. Those are decisions that are all made by the company in the United States.  Not -- not in Mexico.

**JUDGE BENITEZ:**  And where would they have been made?

**MR. FANNING:**  In Utah or Arizona.

**JUDGE BENITEZ:**  Okay.  Thank you.

**JUDGE CALDWELL:**  Other questions?

(No response)

**JUDGE CALDWELL:**  Thank you very much.

**MR. FANNING:**  Thank you, Your Honors.

**JUDGE CALDWELL:**  Mr. Evans, you have one minute.

**MR. EVANS:**  Thank you, Your Honor.

That started out with what I think is an unfortunate misrepresentation of some pre-suit discussions, which, I can't really go through all of them.

**JUDGE CALDWELL:**  I can't hear you.

**MR. EVANS:**  Sorry about that.

That started with some unfortunate misrepresentations of the pre-suit discussions that we had.

At the end of the day, there's a very big difference between what defendant characterizes as threatening an MDL versus revealing what is a likely procedural outcome when there is a large volume of cases.

And, I don't think that plaintiffs' attorneys or anyone should be excoriated for attempting to resolve cases pre-suit, in an efficient way, without resorting to nationwide litigation.

Judge Benitez was correct in saying that the defendant

gets an efficiency advantage by litigating in this way throughout the country, because it gives them the advantage of an asymmetry of information.  They get to gather information all throughout the country and, like, not share it among the individual plaintiffs.

And lastly, with the "If you build it they will come," it's sort of a curious argument, along with the advertising.  What comes is actual cases.  Advertising reveals actual cases, rather than creates them.

**JUDGE CALDWELL:**  Thank you.

**MR. EVANS:**  Thank you.

**JUDGE CALDWELL:**  We have a question.

**JUDGE GORTON:**  Isn't the question:  There's a large volume of cases because you advertised, and they've responded to your advertisements?

There was a charge made that was pretty serious by opposing counsel that there was false advertising in this case.  Not only false advertising, but false advertising by an attorney at law.

How do you respond to that?

**MR. EVANS:**  So I don't know anything about, um, false claims in advertising, as the defense counsel pointed out.  One of the -- the marketing mechanisms that we use is just a website.  And, how does an individual get information from the website?  They actively go and visit it.  They seek out that

information.

JUDGE GORTON:  He said that you said that the FDA had made certain rulings that it did not make.  How do you respond to that?

MR. EVANS:  So I have never said that the FDA has made rulings that they have not actually made.  Mr. Fanning was referring to other attorneys that -- which he didn't name, which have no affiliation with me.

So I have no way to respond to that charge because I don't -- it wasn't my firm.  And I don't have any additional information about it.

JUDGE CALDWELL:  Yes, Judge Kimball.

JUDGE KIMBALL:  If we centralize, what is your -- how do you feel about Arizona or Utah?

MR. EVANS:  Those two jurisdictions are generally less accessible.  With a litigation that is nationwide in scope, having a central -- geographically central location is more efficient.

And, you know, Kansas City has a lower cost of living.  So, things like hotels for status conferences and things like that, going to result in a lower common benefit assessment bill that'll have to be borne by plaintiffs at the end of the litigation.

JUDGE CALDWELL:  Judge Kennelly.

JUDGE KENNELLY:  Okay.  So if we did everything

central, then all MDLs would be actually in western Kansas or in Southern Nebraska, because that's the geographic center of the United States, but whatever.

You're actually trying to say that it's easier to get into Kansas City by plane than it is to get into Phoenix?  I mean, you can't make that with a straight face.

**MR. EVANS:**  Well, sure.  Because who will be traveling are the plaintiffs' counsel throughout the country.  From Maine.  From --

**JUDGE KENNELLY:**  Nobody gets a direct flight to Kansas City unless they're coming from where I live, or from Minneapolis or from St. Louis.  Pretty much everyone gets direct flights to Phoenix, or can.

Anyway, just a thought.

**MR. EVANS:**  Sure.

**JUDGE KENNELLY:**  The center-of-the-country argument, I mean, the lawyers from Missouri always make that argument. But --

**JUDGE CALDWELL:**  Other questions?

(No response)

**JUDGE CALDWELL:**  Thank you very much for your argument.

**MR. EVANS:**  Thank you.

**JUDGE CALDWELL:**  That concludes the Panel's consideration of MDL No. 3081, and our business for the day.

We'll stand adjourned.

**THE CLERK:**  All rise.

(Proceedings concluded)

CERTIFICATE OF TRANSCRIBER

I, BELLE BALL, CSR 8785, CRR, RDR, hereby certify that the foregoing is a correct transcript, transcribed to the best of my ability from the official electronic sound recording of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

*Belle Ball*

_____/s/ Belle Ball_____

Belle Ball, CSR 8785, CRR, RDR

Monday, August 7, 2023